Amos Wetmore, Appellant,

*against*

Hugh White, and Hugh White Junior, Respondents.

ALBANY,
February, 1805.

Wetmore
v.
White & White.

THE appellant being seised of 250 acres of land, on the *east* side of the *Saghquate* creek, in *Whitestown*, together with a moiety of the soil under water, and the respondent, *Hugh White*, the father, being scised of 300 acres on the *west* side, with the other moiety of the bed of the creek, entered, in the year 1787, into a verbal engagement, to divert, on their joint account, for the use and purpose of mills to be erected, the water of the stream to such spot in the grounds of either, as should, in the opinion of one *John Beardsley*, be most proper for the site of a mill. In pursuance of this agreement, *Beardsley* examined the ground on both sides of the creek, and fixed upon a place in the lands of the appellant. Having thus ascertained where the erection should be made, *Wetmore*, *White* senior, and *Beardsley*, on the 13th of *May*, 1788, executed a written agreement, to build a grist-mill, on *Wetmore's* land, a few rods north of his house; he and *White*, to " *own*" each one-fourth of the mill, in consideration of furnishing all materials, &c. and constructing the dam to turn the water of the creek; *Beardsley* to " *own*" the other two-fourths, on doing the carpenter's work, &c. Upon these terms the mill and dam, being in the course of the year 1788, completed, it was, about the time when they were finished, verbally agreed between the same parties, to build, adjoining to the grist-mill, a saw-mill, to be supplied with water in the same manner, and to be " *owned*" in equal proportions by the three. This also being carried into effect, the mills were used and

By a sale of mills, the water of the raceway, will pass as an incident. If the water in a stream be owned by two persons, whose lands are on opposite sides, & they agree to erect mills on the land of one, and turn the whole stream to the mills; it is an appropriation of the water to the mills, and if they be held jointly, or in common, a release of the right of one tenant in the mills, will pass his right in the water also. Payment of consideration money, possession and making improvements, take a case out of the statute of frauds, and will entitle to a decree, for a specific performance.

enjoyed according to the preceding agreements, for about three years; when, being very much out of repair, *Beardsley*, in 1791, in consideration of 600 dollars, by release, duly transferred his interest in them, to the appellant, who, under a parol contract, when they were totally unfit for use, shortly after purchased from *Hugh White*, the father, his proportions, for 187 dollars, and paid the money, but received no conveyance of the shares *White* held in the property, nor was any thing said of the right to the water of the creek.

On concluding the antecedent transactions, the appellant took down the saw-mill, which had become perfectly useless, and rebuilt it entirely. He also, after thoroughly repairing the grist-mill, added a pair of new mill-stones, and peaceably enjoyed both mills, for the space of one year, when they were accidentally burnt down.

Immediately after their being thus destroyed, the appellant, at a very great expense, and without any opposition or molestation from the respondents, rebuilt the mills, and continued in the use and occupation of them, and the uninterrupted enjoyment of the water of the creek, until *August* 1797, when the respondent, *Hugh White*, the father, threatened that he would cut down the dam, and deprive the appellant of the use of the water, unless he would become a *Presbyterian*, and join the congregation under the charge of the reverend *Bethuel Dodd*, and would also build a dam and turn one-half of the water of the creek over a meadow contiguous to the *Saghquate*, and adjoining to the dam erected for the use of the mills; which meadow, on the 25th of *April*, 1794, the respondent, *Hugh White*, had, in consideration of blood

and natural affection, conveyed, with a moiety of the waters of the creek, to his son, *Hugh White*, junior, the other respondent.

In *September* and *October*, 1797, the dam across the creek was, to the great injury of the mills, at three several times cut through, and the water permitted to escape.

On the 5th *December*, 1797, the appellant filed a bill in chancery, stating the antecedent circumstances, with a prayer for a writ of injunction, to restrain the respondents from molesting or disturbing him in the enjoyment of the mills, mill-dam, and the water of the *Sagquate* creek ; that he might be quieted in his possession of them, and for such further, and other relief, as the court might please to direct.

To this bill, the respondents, on the 3d of *August*, 1798, put in their joint and several answers, in which they admitted the situation of the lands of the appellant, and respondent, *Hugh White*, the father; the parol engagement to erect the mill-dam and mills ; the written engagement ; the sale by *White*, of *his shares in the mills ;* the payment of the consideration money ; that there was a preliminary conversation between him and the appellant, about securing, in some proper manner, the water of the creek for the mills when erected ; and a *continued necessity*, for several years after the sale to the appellant, of the mills, *for the accommodation* of the public : that they were burnt down and rebuilt, &c. but the answer denied, that the right or privilege in the waters of the creek, had ever been parted with to the appellant, or that he had paid any consideration for it ; or, that he had any right to appropriate the waters of the creek to the use of the mills ; or to maintain the dam for turning the water from its usual course. The answer

M

also set forth, that 202 dollars and 40 cents, had, besides some other contingent charges, been paid by *White*, the father, as his proportion of the expenses for building the mills, and that he had sold his interest in them, for only 182 dollars 50 cents, at a time when they were in such repair, and in which they continued for a considerable time afterwards, as to be able to do business as well as at any time since their erection. That soon after their destruction, *White*, the father, as he believed, in a conversation with the appellant, explained to him the nature of the contract for the sale of the mills, and then utterly denied the appellant's right to the water; that the appellant had never requested a conveyance of the right of water, and had, from a consciousness of his having none, erected at his own expense, a temporary dam, below that for the use of the mills, in order to turn the water into the respondents' meadow, the want of which, in consequence of the upper dam, annually injured the crop of hay, and could not be compensated for, by even 1,500 dollars; they also insisted on the statute of frauds.

The testimony, the essence of which is given in the decision of the court, in general corroborated the facts in the bill, and from that given by two of the witnesses, it appeared, that the understanding of the parties at the time of the first parol agreement was, wherever the mills were built, " *there the waters were to go.*" That *Beardsley* considered the right to the water, as perpetually annexed to the mills, and never entertained any apprehension of its being liable to be taken away.

The cause having been heard, his honour the chancellor, dismissed the appellant's bill with costs, from which decree he now appealed, and his honour thus assigned his reasons.

*Mr. President.* The appellant deduces his equity from two sources : 1st. A parol contract relating to the saw-mill ; and, 2d. A written contract relating to the grist-mill.

It is necessary, in the first place, to determine the extent of the parol contract, as arising from the admissions and proofs of the parties.

From the terms of the bill, it would appear, that the appellant intended to avail himself of both the written and parol contracts, as forming one general connected arrangement, of the whole interests, in the subject of controversy.

It states, that *it was* agreed between the appellant, *John Beardsley* and *Hugh White*, senior, to complete a *grist and saw-mill*, for their joint use, and at their joint expense, on the land of the appellant.— That *John Beardsley*, was to have one-half of the grist-mill, and the other parties, each one-fourth ; and that each of the parties was to have one-third of the saw-mill, each contributing a proportional share of the expense. That *Beardsley* should allow, to the appellant, a reasonable compensation for his land, and a like compensation to the respondent, *Hugh White*, senior, and the appellant, *for the use of the water*.

The respondents admitted, that it was agreed to build the mills, and that the interests were to be in the proportions stated in the bill. But they deny that any contract was entered into, respecting the water, or that *Beardsley* had a right in it, or paid for it.

The only witness who has any knowledge of the parol contract, between the parties, is *Beardsley*; and, if his testimony is in direct opposition to that

part of the respondents' answer, which he was required to make, by the terms of the bill, it might neutralize the answer, but can have no effect beyond that, unless aided by other evidence or circumstances. But all the circumstances developed, tend to corroborate the answer.

*Beardsley's* testimony is very indistinct, from a want of discrimination, as to the object to which it applies. He confounds the grist and saw-mills; the parol and written agreements; and I found it impracticable, from his relation, to distinguish satisfactorily, what part was intended to apply to the written, and what to the parol contract. The same confusion is discernible as to time; and, whether he speaks of contemporaneous transactions, or those which took place at different periods, cannot be discovered.

Mills are generally calculated for duration. But those constructed by the parties, were so slight, that the appellant alleges, that, at the time he purchased of *Beardsley*, which, it appears, was in *October*, 1790, and probably, not more than two years after they were finished, (for the contract for this erection, was not made till *May*, 1788) they were already out of repair, and in a ruinous state at the time the respondent, *Hugh White*, senior, sold his interest in them, which it appears was early in 1791.

From the permanency of the object of association, on which much reliance was placed by the appellant's counsel, no important result can, therefore, be deduced, in favour of the construction they contend for.

Another circumstance, which throws some light on the subject in controversy, is, the different mode of conduct observed between the appellant and *Beardsley*, relating to the common interest, as far as respected that portion which the appellant contributed towards the common undertaking, and that which related to the property of *Hugh White*, the father.

On the 18th of *March*, 1789, the appellant executed to *Beardsley*, an indenture for the undivided half of his land, intended for the accommodation of the mills, with express covenants for the diversion of the water *in his own land*, for there is nothing in the conveyance, indicating the claim of right to dispose of a privilege of that nature, in the land of the respondent, *Hugh White*, the elder ; and, on the 9th of *October*, 1790, *Beardsley*, by indorsement on that conveyance, regrants the premises to the appellant.—This indorsement is confined to the subject of the former grant merely, and is evidently calculated only to revest the title derived under the conveyance.

There is no evidence of any application for a similar grant to the respondent, *Hugh White*, the father, and though the relationship, which existed between him and the appellant, has been urged as a reason for inducing an unusual confidence between the respondent, *Hugh White*, senior, and the appellant, that consideration would not apply to *Beardsley*, who, in his deposition, alleges, that he supposed the appellant " trusted to the honour and integrity of the defendant, *Hugh White*, senior, and considered the parol agreement as abundantly sufficient." *He* was, however, more interested in the arrangement than

either of the other parties, and he gives no reason for his own conduct.

Both the appellant, and *Beardsley*, appear to have been fully apprised of the necessity of securing their reciprocal rights by conveyance ; and, that it was resorted to, in one instance, and unattended to in another, is a circumstance, which, unexplained as it is, has a strong appearance of a mutual reliance, on the advantages each possessed, to apply them to, or withheld them from, the common object of pursuit. The one party owned the land, on which the mills were erected; the other, so much of the water, as contributed essentially to the value of the mills, though not so much of it, as by withdrawing the water, to render the mills totally useless.

Upon the whole, I do not think a parol agreement is made out in proof, admitting the evidence to be competent to sustain it, variant from, or enlarging the written contract and the parol contract, admitted by the answer, relating to the saw-mills. It is, therefore, unnecessary to examine the influence of the statute of frauds and perjuries on the case.

2d. As to the written contract.

This has no words evincive of the intent of the parties to perpetuate this joint interest, beyond the duration of the mill, which was the object of it. It recognises the land, on which it was to be built, as the land of the appellant, divides the contracting parties, by describing the appellant and the respondent, *Hugh White*, senior, as of the one part, and *Beardsley* of the other part, and thus, by opposing the interest of the latter, to that of the former, shows, that so far as respected the grist-mill, the most intimate union of in-

terest existed between the appellant and the respondent, *Hugh White*, the father; and that the confidence which they had in each other, could have no influence on *Beardsley*.

The mills erected in consequence of the written agreement, were destroyed by fire; and *Hugh White*, senior, declares in his answer, that he informed the appellant, before he rebuilt them, that the water was his; and that he had *not* sold it. This is an answer to the matter stated in the bill, to which he was interrogated, and of consequence available to him, to rebut the deductions, which might be otherwise made, from his tacit acquiescence in the rebuilding of the mills.

The subsequent conduct of both the appellant, and the respondent, *Hugh White*, senior, is an exposition of this intent; for, upon the purchase of *White's* share in the mills, by the appellant, instead of procuring a conveyance from *White*, for the rights necessary for his own accommodation, he is content with a mere verbal relinquishment of the share held by *White*, the father, in the mills. This is perfectly consistent with the views of the parties, if the contract was to operate merely to extinguish the rights acquired by the contract, by the respondent, *White*, senior, in the land of the appellant. But if the appellant's object were to acquire or perpetuate privileges in the land of the respondent, *White*, the father, the grant by him executed to *Beardsley*, and by *Beardsley* to him, show that he must have been acquainted with the proper mode of securing it.

I am persuaded, from the whole tenor of the transaction, that the parties, at the time of the contract, contemplated only a temporary establishment and

accommodation, to remove the inconvenience to which their remoteness from mills exposed them; that the conveyance from the appellant to *Beardsley*, cannot be admitted to aid the construction of the contract between the parties to it, as it does not appear that the respondent, *Hugh White*, the father, had any agency in, or was privy to it; and, that the better construction is, that the reciprocal interests of the parties were to be affected merely, while the principal objects of their enterprise, the mills, endured; that, those destroyed, it ceased to operate.

I was of opinion, therefore, that the appellant's bill ought to be dismissed with costs.

*Platt*, for the appellant.   The equity of the appellant does not arise, *entirely* from the written and subsequent parol agreement, but also from the original parol contract for the erection of the mills, and appropriation of the water.   That there was such an antecedent contract, serving as a *substratum* for the whole, and influencing the future acts of the parties, is proved not only by the testimony, but by the answers of the respondents; and, though *Beardsley* be one of the witnesses whose evidence shows this, yet no objection can be made to his competence, for they have made him their own.   Besides, his assignment was a mere quit-claim.

These parol agreements having been in part executed, are uniformly held to be without the operation of the statute of frauds.   1 *Fonb.* 176 to 190.  1 *Pow. on Cont.* 295 to 299. 2 *Vern.* 455.* 1 *Bro. Ch. Ca.* 417.† 2 *Stra.* 783.‡ 3 *Atk.* 407.§ 7 *Bro. Pa. Ca.* 21.¶

* *Pyke* v. *Williams.*
† *Whitbread* v. *Brookhurst.*
‡ *Earl of Aylesford's case.*
§ *Only* v. *Walker.*
¶ *Newton* v. *Newton & Lee.*

It cannot be argued that the agreements intended to convey only a temporary interest, during the existence of the mills then constructed. The mere circumstance of turning the stream into an artificial and new bed, by digging a canal, negatives such an idea. Suppose the mills had been burnt down the day after their erection, would it have put an end to the contract ?

The establishment was in its nature permanent.— It partook of the quality of the fee on which erected; the water was an appurtenance inseparable from it ; it was like soul and body.

That it was intended to be a permanent establishment, is evinced by the acts of the parties. They are inconsistent with any other intention; and, it is a principle, that where a contract is not definite, but money laid out on it, the court will infer the terms, from the acts. 1 *Pow. on Cont.* 297. 2 *Eq. Ca. Abr.* 48. 5 *Vin.* 523. 2 *Vern.* 373.* The water was indispensable for the mills, and every thing essential to the use of a thing granted, must necessarily pass with it. 1 *Saund.* 322, 3.†

It is also settled, that where a contract is dubious, the strongest construction shall be against the seller. 1 *Pow. on Cont.* 395. 5 *Rep.* 7 *b.*‡ *Plowd.* 140.§ 161.¶ 171.** 289.†† *Co. Litt.* 197 *a.* 267 *b. Roll. Abr.* 228.

These authorities establish, that the respondent sold the waters of the creek. To them may be added 2 *Eq. Ca. Abr.* 685. *pl.* 8. 679. *pl.* 5. *Talbot's cases,* 252.‡‡ 262. 1 *Pow. on Cont.* 302. 2 *Vern.* 363.§§ 2 *Ves. J.* 440.¶¶ which show, that as the conveyance to *Hugh White,* junior, was voluntary, it cannot pre-

N

ALBANY,
February, 1805.

Wetmore
v.
White & White.

* *Halfpenny v. Ballet.*

† *Pomfret v. Ricroft.*

‡ *Dowman's case*
§ *Browning v. Beston.*
¶ *Throckmorton v. Tracy.*
** *Hill v. Grange.*
†† *Chapman v. Dalton.*

‡‡ *Mansell v. Mansell.*
§§ *Dafforne v. Goodman.*
¶¶ *Taylor v. Stibbert.*

vail against a previous *bona fide* purchaser, for a valuable consideration; and, that at all events, as he was a purchaser with notice, the appellant's claim cannot be affected by the grant to the son.

Had he intended to have relied on the deed, it ought to have been pleaded. *Wyatt*, 324, 335. 2 *Atk.* 240.* 2 *Eq. Ca. Abr.* 681. *pl.* 2. As to the statute, it applies to hereditaments.

*Gold and Henry*, contra. The contract was confined to the first mill erected, and the very written contract relied on, is not set forth by the bill, in *hæc verba*, and if that proved be different, the bill ought to be dismissed. 2 *Ves.* 299.† 5 *Ves. J.* 452.‡ In this, there is no mention of any agreement whatever, as to diverting the water, building a race-way, &c. The original parol agreement, can never be in issue. It was nothing more than a preliminary conversation, leading to the agreement, and was, when that was concluded, resolved into it.

Any agreement as to the water, is expressly denied, and if only one witness contradict the answer, no decree can be founded upon it. As to *Beardsley*, his testimony must be totally discarded. It is inconsistent and incredible; besides, being to uphold his own acts, it is totally inadmissible.

If a plaintiff claim lands by a parol agreement, no witnesses can uphold it, for their testimony is inadmissible. None, *aliunde* the answer can be received. 2 *Bro. Ch. Ca.* 566,7.§ Where there is a written contract, no parol evidence is admissible, to alter or vary it, but only to rebut an equity. 2 *Vern.* 34.¶ *Bunb.* 65.** 2 *Atk.* 383.†† 1 *Bro. Ch. Ca.* 93‡‡ 514.§§ 3 *Bro. Ch. Ca.* 168.¶¶ 1 *Ves. J.* 241 *S. C.* 1 *Ves. J.*

* *Brewerton* v. *Gamul.*

† *Legal* v. *Miller.*
‡ *Leg* v. *Haverfield.*

§ *Whitchurch* v. *Bevis.*
¶ *Cokes* v. *Mascal.*
** *Binstead* v. *Coleman.*
†† *Parteriche* v. *Powlet.*
‡‡ *Irnham* v. *Child.*
§§ *Ackroyd* v. *Smithson.*
¶¶ *Hare* v. *Shearwood.*

326.\* 402.† 3 *Bro. Ch. Ca.* 388. *S. C.* 4 *Bro. Ch. Ca.* 437.‡ 3 *Ves. J.* 34.§ 5 *Ves. J.* 688¶.

The doctrine of part performance has rendered the statute of frauds almost a dead letter. Except we be tied down by authorities that govern in this country, we ought to resist it. In England it is admitted to have been carried too far, and to support it, the facts ought to be of the most unequivocal nature. 3 *Ves. J.* 381.\*\* 712.†† 4 *Ves. J.* 720. *Amb.* 586.‡‡ 1 *Pow. on Cont.* 308. 309. 1 *Fonb.* 174, 5. Remaining in possession, is not such a fact as to be conclusive. The acts must be of such a nature, that the purchaser would otherwise be a loser. Here the appellant is more than compensated by his profits from the mill. We, therefore, contend, that the agreement insisted on, is not clearly shown; that part performance is not proved, and that the contract, such as it was, is, from the testimony, variant from that of the bill. To decide the establishment to be permanent, and the appellant entitled to the water, will be to make a new agreement, for both parties.

*Van Vechten*, in reply. The answer, if viewed attentively, will be seen to admit the original parol agreement. With this, the written contract is perfectly consistent. The bill stated the substance of the agreement, and that was sufficient. The cause was submitted in the court below, on this simple question, whether the establishment were permanent or not. To state more than was necessary to show that, is not, by any rule of law or equity, ever required. *Dormer* v. *Fortescue*, 3 *Atk.* 124 and 132. The written agreement disproves a material allegation in the answer, and so is admissible. It is also admissible to

\* *Brodie* v. *St. Paul.*
† *Jordan* v. *Sawkins.*
‡ *Mason* v. *Gardiner.*
§ *Pym* v. *Blackburn.*
¶ *Jackson* v. *Cator.*
\*\* *Wills* v. *Stradling.*
†† *Forster* v. *Hale.*
‡‡ *Gunter* v. *Halsey.*

illustrate the views of the parties.    If the defendant admit the agreement in his answer, he cannot, afterwards, insist on the statute of frauds.

So much water was, from every principle, to be turned off to the mills, as was done in the first instance.    This was concurred in, afterwards, by both parties; therefore, then, no pretence for avoiding the contract, or excluding testimony on the ground of uncertainty.

The agreement to build, was confessedly executed. *White* does not pretend he ever explained his restrictive idea of the contract, till after the sale to the appellant.  What interest did the parties think they had; what had they, in law, in the mills under the first executed agreement?   It must have been a fee.    This they all imagined, and the respondent, *White*, the father, permitted the appellant, under this idea, to go on expending money on the property, without ever undeceiving him.    This was a fraud.

The relief for the appellant must be, 1st, a perpetual injunction; or, 2d, a conveyance, by the *Whites*, of their interests.    The acquiescence of the respondents since 1791, is evidence of a permanent establishment.

The matters contended for by the appellant, the water, &c. are incidents to the mill, not realties.— The sale of the interest in the mills passed them of course.

*Per curiam*, delivered by THOMPSON, J.  The only question litigated between the parties is, touching the right to the waters of the *Saghquate* creek, for the use of the mills, now owned and occupied by the appellant.   A brief statement of some of the facts,

thrown into the case, but not controverted, may afford

some assistance in ascertaining the truth with respect to those in dispute. It is admitted, that, in the year 1788, the appellant was seised of the lands on the east side of the *Saghquate* creek, together with an equal moiety of the creek itself. That *Hugh White* was seised of the lands on the west side of the creek, together with the other moiety of the creek, and that being so seised, they, together with one *Beardsley*, built a grist-mill and saw-mill upon the land of the appellant. That a canal was dug for the purpose of diverting some of the waters of the creek to those mills. That the parties continued to occupy them jointly, according to their respective proportions therein, for about three years, when the appellant purchased out the shares of his copartners. The purchase from *Hugh White* was by parol only, and upon this the controversy between the parties arises, presenting the following questions for examination. 1st. Whether the appellant ever acquired any right to the waters of the *Saghquate* creek, for the use of the mills? 2d. If so, whether that, was a temporary or a permanent right? 3d. Whether, the purchase being by parol, the respondents can avail themselves of the statute of frauds to avoid it?

The evidence appearing in the case, is partly written and partly parol, as to the applicability of which, to the subject matter of complaint in the appellant's bill, some little difficulty and confusion arises. The written testimony, the article of agreement, appears not to have had for its object, the securing of the water to be diverted from the *Saghquate* creek. It was between *White, Wetmore,* and *Beardsley*, and was

solely for the purpose of providing for the building of the mills, and fixing the proportion of the respective parties therein. The matter of complaint by the appellant's bill, is not for a violation of the articles of agreement, but for an interruption in the use of the waters of the *Saghquate* creek. This written agreement might be admissible, as illustrative of the views and intentions of the parties in erecting the mills, and, in some measure, explanatory of the testimony of some of the witnesses; but the right to divert the water must depend upon some other evidence. The bill of complaint, so far as it may refer to the articles of agreement, is to be considered as a history of circumstances leading to the main subjects of inquiry; the right to the use of the water, and the purchase by *Wetmore*, from *White*. The appellant alleges, that he purchased the shares of *White* in the mills, together with the privilege of the water, but reposing confidence in the integrity and uprightness of *White*, he omitted to take a conveyance therefor. This is the subject matter of the complaint, to which most of the testimony on both sides is pointed, and which the appellant alleges was not secured by writing.

The parol evidence on this subject, cannot be viewed as explanatory of the written agreement, or as a preliminary conversation leading to a contract consummated by the instrument in writing; but relating to a distinct and independent subject. An examination, therefore, into the original contract, respecting the water, in connection with the sale of the mills, and a decree bottomed thereon, would not, I think, be travelling out of the case, or a violation of the prin-

ciple, that the decree must be *secundum allegata et probata.*

That there was a contract made between *White* and *Wetmore*, relative to diverting the water to the mills, is manifest from the testimony in the cause, the acts of the parties, and the confessions of *White.* The extent of that contract will be hereafter examined. To establish this contract, there is the united, and uncontradicted testimony of three witnesses.

·*Lemuel Leavenworth*, who was examined both on the part of the appellant and respondents, says, the parties went in the first place, to view the spot where the mills are at present situated; they then viewed the land on *White's* side, and it was agreed, in conversation, that wherever the mill was erected, " *there the water should go.*" That *John Beardsley*, was to determine where the place should be ; and that he determined in favour of the place where the mills now are. To the respondents' interrogatories, he answered, that he knew of a verbal contract, for appropriating the waters of *Saghquate* creek, to the use of the mill or mills, to be erected on the same. *Amos Wetmore*, declared, that he had heard *Hugh White* say, that wherever the mills should be built, there the water should go. *John Beardsley* swore, that it was agreed between *Hugh White* and *Wetmore*, that wherever the mills should be built, there the water should go. In conformity to this agreement, we find the parties digging a canal, building a dam across the *Saghquate* creek, and turning the water to the mills.

*White*, in his answer, I think, impliedly admits, that there had been a contract relative to the water; though he says, the particular plan "*for securing it,*" had not been matured, or carried into effect; evidently, I

conceive, alluding to its not having been reduced to writing.

If, then, there was an agreement to divert the natural course of this creek, the object clearly was for the use of the mills. The same reason that existed at first, for turning the water, would continue to exist as long as the mills remained. By a sale of the mills, generally, I should, therefore, incline to think the water would pass as an incident to them, without any special provision. A contrary inference would be against every reasonable intendment. Supposing the water thus diverted, had been the only water to supply the mills, would there have been a doubt as to the intention of the parties? The quantity of water cannot materially alter the case; and, indeed, it was not denied on the argument, but that the appellant had acquired a right to the use of the water, co-extensive with the duration of the mills first built.

But it is not necessary to say, the right to the water passed, as an incident to the mills, in the sense abovementioned; or, that the appellant acquired this right, at the time he purchased the mills. It was, I think, amply secured by a prior contract; and this will account for the language of some of the witnesses, and the guarded expressions in the respondents' answer.

*Anna Barnard*, a witness on the part of the respondents, testified, that she was present at the time of the sale, and that *White* sold " his right and interest" in the mills, and delivered up his right to the mill and mill-irons, but does not recollect that any thing was said respecting the waters of the creek. The reason of this, probably, was, because the parties considered

the use of the waters provided for by the former con-
tract, made before the mills were erected. *Hugh
White*, in his answer, admits that he sold his shares
in the mills, to the appellant, for the consideration of
seventy-five pounds, and that the purchase-money
has been duly paid. But says, " *at the time* of his
relinquishing his shares, no mention was made of
any right, interest or privilege, in the waters of the
said creek, nor was any such right or privilege includ-
ed *in the said contract of sale, of the said mill.*" With
truth, *probably*, he might so declare, because it was not
necessary to say any thing on the subject, or include
it in the sale, it having been provided for by another
agreement. This he does not undertake to deny.
He only says, the plan was not matured and carried in-
to effect ; by which I understand him to mean, as I
before observed, that no writings were entered into ;
deeming them necessary to mature and perfect the
contract.

I the more readily adopt this construction of this
part of the answer, because it reconciles it with
the evidence. For, if *White* meant to be under-
stood, that no contract whatever, had at any time
been made, respecting the water, he stands contra-
dicted by three witnesses. I consider the effect of
this agreement, as an appropriation of the water to
the use of the mills ; that it thereby became, in some
measure, an appurtenance to them ; and that, under
such circumstances, a grant of the principal subject
would pass the water, as an incident.

The next inquiry is, whether this contract vested a
permanent, or only a temporary right to the use of

O

Wetmore
v.
White & White.

the water ? If I am correct in the construction giv-
en to *White's* answer, it is not such a denial of the
contract, as to bring it within the rule of equity, mak-
ing it necessary to establish it, by the testimony of
more than one witness. That rule can only be appli-
ed to cases, where the answer is a clear and positive
denial of the fact. 1 *Vez.* 66.* But admitting the an-
swer to be a direct denial of any contract, respecting
the water; I should not consider it, under the cir-
cumstances of the case, as coming within that rule.
It is impeached by the testimony of several witnesses,
and there are other facts and circumstances, cor-
roborating the testimony of *Beardsley* on this subject.
2 *Atk.* 19.† 3 *Atk.* 407.‡ 1 *Vez.* 97.§ If *Beardsley's* tes-
timony is to be received as competent evidence, upon
which to ground a decree, under the above rule, it
establishes, beyond all possibility of doubt, a perma-
nent right in the appellant to the water, for the use of
the mills. *Beardsley* being acquainted with the whole
transaction, leading to, and attending the building of
the mills, gives a very minute account respecting the
business, and declares most unequivocally, that the
agreement was, that the water diverted from the main
channel of the creek, was to be for the supply of the
mills for ever. In this he stands, in some measure
corroborated by the testimony of *Leavenworth* and
*Wetmore*, who say, that it was agreed, that wherever
the mills should be built, there the water should go.
The latter declared also, that when *White* sold his
right and title in the mills to the appellant, he sup-
posed the use of the water *perpetually* was intended
likewise to be sold.

* *Le Neve* v. *Le Neve.*

† *Walton* v. *Hobbs.*
‡ *Only* v. *Walker.*
§ *Arnot* v. *Bris-co.*

It is said, however, that *Beardsley* has so contra- dicted himself, with respect to the consideration paid by *Wetmore* to *White*, for the water, that he is un- worthy of credit. This allegation, I do not think well founded. In his answer to the appellant's interroga- tories, on this first point, he says, that *White* was to have one-fourth part of the mill, on account of his al- lowing the water to be turned from the main creek, for the use of the mill forever, and for digging, drain- ing and turning the water; and, in consideration of other things mentioned in a certain written contract. In his answer to the respondents' interrogatory, he says, the consideration that *Wetmore* paid *White*, for the use of the water was, that the waters overflowed the lands of *Wetmore*, and that *White* was to have one- fourth part of an acre of land forever, with the mills erected thereon; one-fourth of the grist-mill, and one-third of the saw-mill, and that he supposed the said contract was completely finished and carried in- to effect.

ALBANY,
February, 1805.

Wetmore
v.
White & White.

The latter examination is more full and circum- stantial than the former, but is not, I think, so essen- tially variant, as to discredit the witness. There is, to me, internal evidence arising from the nature of the establishment, and the acts of the parties, forti- fying the conclusion, that it was the intention of the parties, that so much of the water of the *Saghquate* creek, as was necessary for the use of the mills, should be permanently appropriated to that object. A con- trary conclusion, would lead to great doubt and un- certainty. If the appropriation was considered as coextensive with the necessity that at first existed for mills at that place, its termination would depend upon mere matter of opinion. If, with the duration of the mills first erected, doubts might arise to what

extent repairs might be made, for the purpose of continuing the old mills; and to say, that they should be suffered to go to decay, without any repairs, would be doing violence to the understanding of the parties. Public accommodation, and private emolument, were probably the primary inducements for building the mills, and diverting the water; the same reasons, for any thing that appears, now exist for their continuance.

The conduct of *White*, in not disclosing to *Wetmore*, at the time of selling the mills, his claim of restoring the water to its original channel, his sleeping so long upon this claim, and permitting the appellant to expend his money, in repairing and rebuilding the mills, were unconscientious, and form strong grounds for the interposition of a court of equity. 2 *Atk.* 83.*

* *East. Ind.
Com.* v. *Vincent.*

It is true, the respondent, *Hugh White*, swears, that he *verily believes*, he apprised *Wetmore* of his claims, before the mills were taken down or destroyed. This, I do not think entitled to much weight. If the fact would warrant it, he ought to have sworn positively, and not merely as to his belief. Besides, it is rendered highly improbable by his acquiescence for five years together. Much was said on the argument, respecting the injury, which the diversion of the water would occasion to the respondents' meadows, and, much of the testimony in the cause was pointed to that object. This testimony is vague, uncertain, and, in my opinion, irrelevant. If testimony of this kind was proper at all, as furnishing a clue to the intent and understanding of the parties, it should have been confined to the time when the contract was made; and on that subject, we have the estimation of *White* himself; for it appears, from the testimony of *Beards-*

*ley*, that he considered the water of so little use to him, and the establishment of the mills so unpromising, in point of profit, that he offered to give the appellant and *Beardsley* the use of the water forever, together with a barrel of pork, if they would build a grist-mill and saw-mill alone, and he to have no concern with them.

ALBANY,
February, 1805.

Wetmore
v.
White & White.

The appellant's claim, resting altogether upon parol contracts, it becomes necessary to examine, whether any obstacle to relief is interposed by the statutes for the preventions of frauds. I think there is not. It is an established rule in equity, that a parol agreement, in part performed, is not within the provisions of the statute. 1 *Fonb.* 182, and the cases there cited. 3 *Atk.* 4.* To allow a statute, having for its object the prevention of frauds, to be interposed in bar of the performance of a parol agreement, in part performed, would evidently encourage the mischiefs the legislature intended to prevent. Money laid out in improvements, is considered a part execution of a contract. *Pow. on Contr.* 296. So, also, possession, delivered in pursuance of an agreement, is such a degree of performance, as to take a contract out of the statute. *Ibid.* 299. Payment of the consideration money, has always been held as a part performance. 3 *Atk.* 4.†

* *Lacon* v. *Mertins.*

† *Lacon* v. *Mertins.*

The case before us, I think, clearly falls within these rules. The consideration money has been paid, possession taken, and valuable improvements made. I can therefore see no objection against granting the appellant such relief, as will quiet him in the permanent enjoyment of the water, for the use of the mills, to the extent the same was used and enjoyed, at the time he purchased them from the respondent, *Hugh*

*White.* This is sufficiently certain and definite, for a decree for a specific performance.

I am, therefore, of opinion, that the decree of the court of chancery ought to be reversed.

*Judgment of reversal* unanimously.