## HAIGHT v. THE CITY OF KEOKUK.

No matter can be pleaded as *res adjudicata*, which was not covered by, or embraced in, the pleadings of the former suit.

Matters which arise only incidentally, however much they may influence the mind of the judge or jury in arriving at a conclusion, are not matters adjudicated.

In order to make the judgment in the former action a bar to the latter, it must appear that the subject matter of the two actions are the same.

Where in a proceeding to enjoin the city of Keokuk from prosecuting an action against one L., for refusing to pay wharfage for landing at said city, as required by an ordinance of said city, the complainant claimed to be owner of lot six, in block six, in said city, and of the wharf where such landing was effected, and alleged that in December, 1851, he had a wharf boat lying in front of and against said wharf; that the city, under an ordinance prohibiting any person from keeping a wharf boat at any of the wharves, without a license, commenced suit against petitioner for keeping such boat, he having obtained no license; that said suit was appealed from the mayor's judgment to the District Court, where the question was presented as to the rights of the parties; that at the January term, 1852, said court found the facts to be, that the ground in front of said lot belonged to the complainant and those under whom he claims, to the middle of the main channel of the Mississippi river, and that the city had no right to the same as a wharf; and that said court rendered judgment against the town, in which suit the facts on which defendant relied as a defence, were not pleaded, but given in evi-

dence under the plea of *not guilty ; Held*, That the judgment in that case was not conclusive upon the rights of the parties.

Where the plat of a town, situate on the Mississippi river, duly acknowledged and recorded, declared that "all the streets and alleys shall be and remain public highways forever, *except Water street*," and certain alleys named, which plat was signed by G., "for himself and others," and where in a subsequent suit for partition between the owners of the town, the commissioners, in their report, adopted in the main the plan of the town as laid out by said plat, in respect to the blocks, lots, and streets, and did not except any of the streets from the effect of the dedication as public highways; and in speaking of share eighty of the town, in which is the lot of complainant, the report says: "All the town lots included in the above share, are bounded by the middle of the streets and alleys on which they are situate," and of those next the river, says: "and those upon Water street, include also the land in front of them to the Mississippi river;" which report was adopted by the court, and a decree rendered in accordance therewith:

*Held*, 1. That the original plat, so far as it was adopted by the report of the commissioners and the decree, became of force; 2. That the report and decree placed Water street upon the same ground, as to publicity, with the other streets; 3. That all the streets were dedicated as highways, and are public; 4. That the exception of Water street on the plat, from the dedication, was void for repugnancy; 5. That the lot owners owned the soil to the middle of the streets and alleys, subject to the public right to the use, control and management of the highway; 6. That the owners of lots fronting on the Mississippi river, own the fee of the land to the river, subject to the public easement; 7. That Water street extended to the river bank, and was not limited in width to the dotted lines marked on the said plat.

A reservation or exception repugnant to the grant, is void.

The proprietor of land upon the bank of, and adjacent to, the Mississippi river, does not own to the middle of the main channel of the river, nor to lowwater mark, but to high-water mark only.

Such proprietor owns to the edge of the bank of the river, and the *whole* bed of the river belongs to the public.

The grant to the Sac and Fox tribe of Indians by the United States, of certain lands, by the act of Congress, of June 30, 1834, was to said Indians as individuals, and is to be construed like any other grant or sale to individuals.

A piece of land dedicated to the use of the public, as a *street*, may be used for the purposes of a *wharf*, for the landing of passengers and the depositing of freight, without any infringement of the right of the owner in fee of the land.

## Appeal from the Lee District Court.

THIS is a petition for an injunction. The injunction was allowed by a judge of the Supreme Court, and was returned

to the District Court, when, on hearing on bill, answer, and testimony, the bill was dismissed, and the injunction dissolved.

The facts, as set forth in the petition, are as follows: that Haight is the owner of lot six, in block six, in the city of Keokuk; that in 1850, he erected a warehouse "on said lot, and in front thereof;" that he, and those under whom he claimed, have had possession of the lot since prior to 1841; that in 1842, the owner of the lot commenced building a wharf in front of the lot, out into the Mississippi river, prior to which there was barely room for a wagon to pass in front of the lot, between that and the river, at an ordinary stage, but the wharf has been extended so that now there is a distance of some sixty yards from the lot to the water; that he is the owner of all the ground in front of the lot, to the middle of the river, and has never parted with the title or use thereof, as a wharf; that one D. W. Kilbourn is the owner of lot four, and one Andrew Brown the owner of lot five, in the same block, which are adjacent lots; that said wharf has been extended in front of those two lots also, which part of the wharf he holds and occupies by agreement with those owners, of several years' standing; that the wharf and warehouse have been used for the purposes of such structures, and are a great accommodation to the boating and navigation of the river; that the city has passed ordinances requiring those navigating the river by steamboats to pay wharfage upon landing at the wharf of the city, including the above wharf; that the city authorities threaten to prosecute any who shall so land, without paying wharfage; that they have commenced a prosecution against one Laville, captain of the steamboat Shenandoah, for refusing to so pay, upon landing at complainant's wharf, although he had the full permission of the petitioner; that the threats of the city authorities to sue persons thus landing, without paying wharfage, have the effect to deter many boats from landing at his wharf, and thereby to greatly diminish his business of storage, for which he is remediless at law; and that the city has been at *no* expense in making the wharf,

nor has it compensated petitioner for his outlay, nor those under whom he claims.

He then sets forth, that in December, 1851, he had a wharf boat lying in front of said lots, and against said wharf; that the city, under an ordinance for regulating the wharf, and prohibiting any person from keeping a wharf boat at any of the wharves, without license, commenced suit against petitioner, he having obtained no license, and claiming that said wharf is his own property, and, therefore, he was not liable to fine; that that suit was appealed from the mayor's judgment to the District Court, and the question was presented to the court, as to the rights of the parties; and that the court, at the January term, 1852, found the facts to be: that the ground in front of said lots belonged to the complainant, and those under whom he claims, to the middle of the main channel of said river, and that the city had no right to the same as a wharf, and rendered judgment against the town.

The petitioner, therefore, prays an injunction against the town, to prohibit the collection of wharfage from boats and vessels landing in front of said lots, and prohibiting the prosecution of suits against persons for landing vessels at said wharf, without paying wharfage, and enjoining the further prosecution of the suit against said Laville, until the final hearing of this cause; and that petitioner may be quieted in his title to the wharf, and the use thereof.

The answer, so far as is necessary to state it, (for much is superseded by an agreement on the facts), states, that Haight, of his own wrong, erected his warehouse; that in 1849, the town commenced building a wharf upon the river, according to a plan adopted; that at that time the warehouse stood projecting into Water street, and was far below the level of the intended wharf, and the town could not proceed without covering the house, and obstructing access thereto; that Haight was a member of the city council at the time of the adoption of said plan, and approved of it, and yet continued to make his private wharf, with intent to embarrass the town, and prevent her from exercising her rights as the pub-

lic necessities demanded; that petitioner has made the greater part of his expenditure upon his wharf since the town commenced building her wharf; that she has expended more than 25,000 dollars upon the public wharf; that petitioner's wharf is far below the level of the public wharf; and that if petitioner's pretensions are sustained, the city will practically be deprived of the power to collect wharfage to aid in paying for their improvement.   The answer denies that petitioner is the owner of the said land to the middle of the main channel of the river, and that he has not parted with the *use* thereof.   On the contrary, it alleges, that the whole of the land on which Keokuk is situate, to the middle of the river, is part of the so-called Half-Breed tract, in Lee county; that prior to the partition, under the decree in 1841, one Isaac Galland had laid out the city, as it now is, into blocks, lots, streets, alleys, &c., and caused a map to be made and recorded, which map is referred to and made part of the answers.   The answer refers to, and sets forth, the substance of the proceedings in partition, the decree in which is made part of the case in evidence.   The respondent alleges that no new division or plat of the town was made, but that Galland's map, with a few exceptions, was adopted; that a map was made and returned by the commissioners, conforming substantially to Galland's, and that the property was distributed among the parties to the decree according to the numbers, lines, and subdivisions of the said map; that by virtue of the proceedings in partition, and the assent given thereto, the whole of the land in front of the lots on Water street to low water, and thence, by construction, to the middle of the main channel, was dedicated to the public use, but that the proprietors retained the right of soil, and the fee simple; that one Antoine Le Claire, in said partition, drew, by lot, the said lots four, five, and six, in block six, and conveyed them, by that designation alone, without any reference to the ground in front thereof, and by the same description the present proprietors, whoever they may be, hold them; and that the mere fee simple, or right of soil, belongs to them, while the *use* is in the public.

The answer further alleges, that in the proceeding and de-
cree in partition, the land in front of the lots on Water street
is placed upon the same footing as the land forming other
streets in the town; that in both cases the right of soil is re-
tained in the proprietors, and the use dedicated to the pub-
lic; that under the municipal authority, the principal streets
have been opened, graded, improved, and long used, with-
out interruption or objection; and that in years past, the
town has collected wharfage for every part of the wharf, in-
cluding that claimed by petitioners.

The respondent denies that in the suit of the city against
said Haight, the court found that the right to the use of the
land in front of said lots, was in complainant, and denies
that the subject matter of this suit has been adjudicated, but
that in said cause, it appeared that the then city limits ex-
tended to low-water mark only, and therefore its jurisdiction
extended no farther, while petitioner's boat was moored out-
side of said low-water line; and upon the whole finding, the
court held said Haight not guilty, without stating upon what
ground; that in January, 1853, the General Assembly ex-
tended the limits of the town, and conferred jurisdiction to
the middle of the river, and gave power to establish and reg-
ulate a wharf, and to use the whole of Water street for that
purpose; that in September, 1853, the council passed an
ordinance, declaring the whole of Water street, and of the
land between that and the middle of the river, to be a wharf,
and subject to that use, and to the regulation pertaining to
wharves and wharfage; and that it is true the city has not
expended any money in making that part of the wharf, nor
paid said Haight his expenditures, for reason that his own
wrongful acts interfered with the plans and works of the city,
and he claimed to own the same as his private property.
The defendant concludes by claiming that there is no equity
in the bill, nor ground for injunction, because, first, the
remedy at law is adequate and complete; and, secondly,
there is no ground stated upon which a court of equity can
interfere.

An agreement between the counsel makes the following papers and facts evidence :   The affidavits are to be taken as depositions: the accompanying decree and proceedings in the suit for the partition of the Half-Breed tract of land; certain maps and plate connected with that suit; the ordinance of the city of Keokuk, in the originals, or in the printed volume; that Brown has title to lot five, and Haight to lot six, in said block six, for the purpose of this suit; that Haight had permission from the other owners; the accompanying copy of the case of *Keokuk* v. *Haight;* the copy of the case of the same city v. *Laville;* that in the deeds conveying to Haight, the said lot is described as lot six in block six, in the city of Keokuk, Lee county, Iowa, and not otherwise; and that the statement of Guy Wells, and his map, may be used by either party.

*Samuel F. Miller*, for the appellant.

*James M. Love*, for the appellee.

WOODWARD, J.—The thought which first demands our attention is, that this matter has been already adjudicated. In this respect the position of things is as follows:   In December, 1851, the city of Keokuk sued Haight for the penalty for keeping a wharf boat at the wharf of that town, without a license so to do.   The defendant pleaded not guilty of a violation of the ordinance.   He was charged with keeping the boat at the wharf or levee built by him, out from the natural shore, in front of lots four, five and six, in block six, mentioned in the statement.   The facts which give rise to the question, were not pleaded, but were given in evidence under the above plea.   The cause was submitted to the court on fact as well as law.   Under the statute, the court reduced to writing its finding of facts, and the law which it applied.   It finds many facts, and among them, that the land was, prior to, (a time not named,) private property; that in the year, (left blank, but which in fact was 1840,) Isaac Galland, professing to act for himself and other parties, &c., laid out the town of Keokuk; that there is noth-

ing to show that at the time Galland laid out the town, " he had any title or right to the same," or any authority to act for the owners, farther than is shown upon the face of the map, (which is his certificate and acknowledgment, signed "for himself and others, proprietors;") that the plat was not made, acknowledged and recorded so as to vest the streets, alleys and public grounds in the town; that by the notes upon the map, it is declared that the streets and alleys shall be public highways, with some exceptions; and that among such exceptions is Water street, which the court finds was not made a public highway by the act of Galland, nor the operation of law; that in the proceedings for partition (which the court finds), between the owners and proprietors, the town as laid out by Galland, was recognized, adopted and made a part of the decree; that in said decree the town lots were bounded by the middle of the streets and alleys, and those upon Water street included all the land in front of them to the Mississippi river; that lots four, five and six, in block six, lie upon Water street, and included all the land in front of them to the river; that the owners own the right of soil to the middle of the river; that Haight owned lot six, and had permission from the owners of four and five, and kept a wharf boat on the river in front of those lots; and that the city by its charter, has authority to establish wharves upon city property only, and fix rates, &c., when so established, &c. Other facts are found, but they are not deemed material. Wherefore the court found that he was not liable to the penalty for not taking out a license to keep his wharf boat, in accordance with the ordinance, and therefore rendered judgment for the defendant.

The question now is, whether the judgment in the above cause is a bar to the present one, which is a bill for an injunction to restrain the city from suing persons for landing boats at the wharf, without paying wharfage. The former suit involved, at most, only the question, whether Haight had a right to keep a wharf boat, as he was doing. Now, however similar the evidence may be in its detail, or the facts developed by the testimony, the questions are totally

unlike. The objects and ends of the two suits—the relief sought—are quite diverse. Allowing the complainant the utmost benefit of the former suit, he could say no more than that it was decided, that he had a right to keep a wharf boat at that place; and this has no apparent nor necessary bearing on the question of the power of the city to demand wharfage. Neither the judgment, then, nor the pleadings, show anything to our present purpose; but to find anything, we have to look beyond them, to the finding of the court. This is in the nature of a special verdict. Such a verdict would find facts only. The rest is the law held by the court. The court held that defendant had the right of soil, and then inferred or held, that in law he had the right to keep the boat, and therefore rendered judgment for him. Now, all this, except the judgment, is incidental. It comes up in the evidence. There is nothing put in issue concerning the title; and to make it conclusive, the matter should, in some manner, have been put in issue. The right of soil, or property, was not the matter in issue, although it was made incidental to it by the evidence. An estoppel, in these cases, arises from the point or matter of fact having been once distincly put in issue, and having been on such issue joined, solemnly found against the party. 2 Phil. Ev. (ed. 1849–50) 18; 4 Cow. & Hills (ed. of 1849–50) 12 *et seq.*, and note 12, *et seq.*

In order to make the matter a bar, it must have been embraced in some of the pleadings, or in the issue in the former action. 2 Phil. Ev. *ut sup.* 13 to 19; 2 Pick. 20. Thus, any demand or claim embraced in the declaration, or any right or title set up in defence, in a plea, may become a bar; and parol evidence is sometimes admitted to show what was tried or submitted. But this is only, to show that some particular item, demand, claim, or right, which would be covered by the declaration or plea of notice, was submitted or was not, as under a general count for money demands, or under a general submission to award, to show that certain demands or subjects were heard and submitted. But it is apprehended, that no matter can be pleaded as *res adjudicata,*

which was not covered by, or embraced in the pleadings of the former suit. Matters which arise only incidentally in the evidence, however much they may influence the mind of the judge or jury in arriving at a conclusion, are not matters adjudicated. 2 Phil. Ev. 12 to 23, chap. 1, § 1, div. 3. The case of *Standish* v. *Parker*, 2 Pick. 20, is a case in point, in which PARKER, C. J., says: "The principle adopted is, that in actions of trespass, or for torts generally, nothing is conclusively settled, but the point or points put directly in issue." The matter there sought to be set up as *res adjudicata*, was a right of way, and its position or relation in the suit was remarkably similar to that of the right here set up as a bar. But there is a great difference between the two cases, in one important respect, viz: that the matter or right was the same in the two suits, whilst in the case at bar they are different.

This leads to another rule. The matter of the two actions must be the same, in order to make the one conclusive in the other. 2 Phil. Ev. 5. And it is difficult to see how the matters of these two suits can be considered the same. They may be determinable by the same facts—the same rights or title—but those facts, or that right or title, were not pleaded in the former suit, nor embraced in its pleadings, but arose only incidentally in evidence. The question is a delicate one, and requires discrimination, but we think it clear, upon the whole, that the judgment in the former suit is not conclusive upon the present.

Under this state of things, the case is open to an inquiry into the claim of complainant. He insists, in his bill, that he is the owner of all the ground in front of said lot, to the middle of the main channel of the river, and never has parted with the title, nor the use of the same, for the purposes of a wharf, to the public, nor to the city of Keokuk, nor to any other person. The prayer of the petition is based upon this supposed right to the use of the land between the lots and the river, the same argument being applied to lots four and five, and the land in front of them.

The plat of the town, made by Galland, and the proceed-

ings in partition are in evidence.    By the treaty of August
4th, 1824, (7 U. S. Stat. at Large, 229,) the Sac and Fox tribes
of Indians ceded to the United States, certain lands, includ-
ing those known as the Half-Breed tract, with the following
stipulation as to that tract: "It being understood that the
small tract of land lying between the river Desmoines and
Mississippi, and the section of the above line between those
rivers, is intended for the use of the half-breeds belonging
to the Sac and Fox nations," &c.    By the act of Congress
of June 30, 1834, (4 U. S. Stat. at Large, 740,) the United
States relinquished and vested in the said half-breeds or
those relations who, at the passage of the act, were entitled
to the same, all the right, title and interest which might ac-
crue or revert to the United States in those lands, with
power of sole devise and descent.    Many persons of the half-
breed race conveyed away their interest.    In 1840, Isaac Gal-
land laid out the town of Keokuk, his certificate being signed
by his name, "for himself and others, proprietors."    In
1841, there was a decree of partition between those found
to own shares, being one hundred and one in number.
Galland's map declares that all the streets and alleys shall
be, and remain public highways for ever, except Water
street, and certain alleys.    The commissioners adopt, in the
main, the plan of the town, as laid out by Galland, in re-
spect to its blocks, lots, and streets.    In their report, they
do not except any of the streets or alleys from the effect
of the dedication as public ways.    Galland's map made
three squares public, two (at least) of which the report as-
signs to individuals; but yet recognizing them all as
"squares," in these words: "Arch, Fayette and Chatham
squares are each three hundred feet square, or the size of an
entire block."    The report uses the following language in
respect to the town lots generally: "All the town lots in-
cluded in the above share, are bounded by the middle of the
streets and alleys on which they are situated," and of those
next the river, it says: "And those upon Water street, in-
clude also the land in front of them to the Mississippi river."
The above is the language used in relation to share M 80,

14

which was Haight's, and by which he obtained lot six in block six; and similar language is used in respect to the shares by which lots four and five were obtained.

The complainant claims some effect from the circumstance that Galland's map does not make Water street a public street. There is no evidence of Galland's authority to lay out a town and record its plat, other than his certificate and acknowledgment upon the map, and the fact, subsequently appearing, that he had an interest in the tract of land. So far as it was adopted in the report and decree, it becomes of force; but where the report and decree depart from it, it is not of force. The latter place Water street upon the same ground, as to publicity, with all the other streets. There is nothing said as to their being public or highways, but they are laid out and named, and called streets, and are in a town. They stand upon the usual ground of streets in a town, whose plat or map is recorded; and in that manner, and so far as that effects it, are dedicated to the public use. In other words, they are dedicated as highways, and are, therefore, public.

But assuming, for the moment, Galland's authority to make the town, it may very well be doubted, whether his exception of Water street from such dedication, was not invalid for repugnancy. A reservation or exception repugnant to the grant, is void. This case is just as if the whole matter were written out in words. The law gives a certain meaning to a plat or map of the town, acknowledged and recorded, without many explanatory words. It is called or named the map or plan of such a town; it is divided into blocks or squares, and lots, and these are numbered; between the squares are spaces, as for ways; and suppose them not named, and not called streets, the proprietor sells lots to various persons. Now, it may well admit of a reasonable doubt, whether he would be permitted to say, that these spaces were not streets and highways; and whether the law does not give to his acts such a signification. But when he calls them streets, and names them as such, it would seem that all doubt is removed. A town, with blocks behind

each other, to the number of ten or twenty in depth, without streets, would be an anomaly. When he says Water street is a street, but it is not public—it is a highway, but it is not public—this would seem to be incongruous and repugnant. But the report, and the decree adopting it, do not adopt this absurdity. This street stands, as the others do, as regards its publicity.

But what is the effect of the language in the report and decree, that the lots are bounded by the middle of the streets and alleys on which they are situated? It is to give the lot owner the same right in the soil, as the owner of land has in his land over which a highway runs. He owns the soil—the land—the fee simple—but subject, always, to the public right to the use, control, and management of the highway. If the town should be vacated, he would own the land, and with it the use, up to the middle of what had been the street; It is so of Water street in Keokuk. By this decree or partition among the proprietors, those fronting the river, in like manner, own the land—the fee—to the river. But it is subject to the public rights and wants. The lot owner has very little of present interest in it. He does not own the present use. If the town should be vacated, he would then own, and be able to occupy, to the river. But as long as there is a town, it is public, and the use, control, and management of it, is in the public somewhere, and by the charter, this control is placed in the municipal government.

It is taken for granted that no one supposes that, under the language above quoted, a lot proper extends to the middle of the street, for the lots are described, in both Galland's map and the report, as having certain dimensions, say fifty feet in width, and one hundred and forty in depth or length generally; and, again, this construction would leave it a town, without streets! The same reasoning applies to Water street. No other reasoning than the foregoing will answer; for it is impossible to suppose that the proprietors, in laying off a commercial town upon a great navigable river, intended to cut off from free access to that river, all but those who owned the front lots, and thus take away that

which constitutes the greatest value of them all. What makes the land of this town of more value than a common farm? It is its adaptation to commerce and trade, through its accessibility to a large navigable stream, and thence its communication with the rest of the world.

Again: the petitioner argues that Water street is limited to the width marked on the dotted lines, and that he has right to the space outside of that. Not so; this street is thus described in the report: "Water street extends the whole front or river side of the town, or from the intersection of Orleans street, (on the upper side), with the Mississippi river, down the right bank of said river, with the meanders thereof, to the intersection of Cedar street, (on the town side,) with the Mississippi river." The lines were probably intended for convenience, as indications of distances then existing, but at any rate, must, according to the well-established rule, yield to great natural objects designated as marks and bounds. But, as a consideration of more weight, the report and decree do not adopt these lines and distances, although the map attached thereto shows them. The description of this street, in the report, is as given above, and in fair interpretation, leaves it as undefined in width, extending to the river, and forming the river front of the town.

We must give a little attention to this part of the cause. In the case of *McManus* v. *Carmichael*, 3 Iowa, 1, after a very full argument and hearing, and a careful examination of the subject, as it has been adjudicated upon heretofore, it was determined that the proprietor of land upon the bank of, and adjacent to, the Mississippi river, does not own to the middle of the main channel of the river, nor to low water, but to high water only—that is, he owns to the edge of the bank—and that the whole bed of the river is in the public. If we divide a river into its parts, it consists of banks, bed, and water, and the bed includes the shores; for, to constitute a part of the bed, it is not necessary that it should be always covered by water, yet in order to obtain intelligible terms for different parts, it is often divided into banks,

shores, bed, and water, still the shore is a part of the bed, or bottom of the river. It is probable that confusion and misunderstanding of cases has arisen from the use of this term "bed" of a river, in different senses, sometimes in its broad and true sense, and sometimes in a limited one, measuring only that part which is always covered by water.

According to the case of *McManus* v. *Carmichael*, then, Haight owns the soil to high water only. But here is interposed the argument, that this land is not held under the United States by the usual manner of grants, that is, by patent, after a survey, and described by section, town and range. This is true; but yet it will not affect the extent of the complainant's right. The grant to the half-breeds, was to them as persons, and not as a political body. The political jurisdiction remained in the United States. Had the grant been to them as a political society, it would have been a question of boundary between nations or states, and then the line would have been the *medium filum aquæ*, as it is now between Iowa and Illinois. But such a grant could not be, without creating an *imperiam imperio*. This was not designed, and was not done. The grant was to them as individuals—as tenants in common—and is to be construed as any other grant or sale to individuals. It has since been surveyed and divided into sections in the same manner as the other public lands, although the country was not then surveyed, yet the grant extends no further on the river shore or bank, than if surveyed. It has been held, that the government cannot convey the land between high and low water on the public or navigable rivers; (*Mayor, &c., of Mobile* v. *Eslava*, 9 Porter, 578; *Same case* on error, 16 Pet. 232;) and that this space and these waters belong to the state. *Mayor &c.*, v. *Eslava*, 9 Porter, 578; 16 Pet. 235, *ut supra; Pollard's Lessee* v. *Filer*, 2 How. 572; *Same* v. *Hagan*, 3 How. 213. Although no state may exist at the time of such a grant, as in this case, yet grants and sales made under such circumstances, are to be construed as having a view to the future sovereignty which may or will arise, and so as not to impair its rights when arisen. It is our opinion,

therefore, that the complainant's right of soil is to be limited to the line established in the case of *McManus* v. *Carmichael*.

One further thought, presented by the petitioner, should be noticed. It is, that if this ground is dedicated to the public, it is as a street only; and that if his rights are subject to the public uses, they are so subject to the use of it only as a street or highway, and not as a wharf, and that it is named and called a street and not a wharf. He claims that the object of a street is for passage, for traveling over, and not to land or deposit goods upon. This is taking a very narrow and close view. The streets of a town are fairly subject to many purposes to which a highway in the country would not be. More regard should be paid to the object and purpose than to the name. The ways of a town would be of comparatively little use if the citizens and traders could not deposit their goods in them temporarily, in their transit to the store-house, and so of other things, and so it is of the wharf. If goods cannot be deposited upon it in preparation for shipping them, or unladen upon it from boats and vessels, why is a town located near the river upon land which, in other respects, is inconvenient, and is expensive to grade, to bring into form and order, and to keep in repair, instead of upon an even prairie, requiring no such trouble and outlay? But this is too plain to require words. Let this be called by what name it may, its object is manifest. It is not intended by this to imply that the name given in such cases has nothing to do with the designation of the purpose of the dedication, but only that it is not to be construed too rigidly, and that the manifest purpose is to be taken into view. Had this been named a wharf or levee, the party would have had the same force of argument in objecting to its use for traveling over it. The name street is sufficiently accurate, and sufficiently opens it to all the public uses manifestly intended.

It should be observed also, in relation to this town, that the whole proceeding is to be regarded as an act of the joint proprietors, laying out a town for their mutual and common

benefit; and hence it should be difficult to adopt any construction detrimental to the interests of a large portion of the town. Such acts should not be construed with close and technical rigidity, although it is true that we must not depart from the settled rules of law. The intent affords the guiding principle. We cannot entertain any doubt that the use of this street, in its full width, is in the public, and the management of it in the municipal authorities. The claim of the town is not one of property, but (as trustees for the still greater public), one of government and regulation, under authority delegated from the supreme civil power of the state, and which is clearly given in the charter of the city. For cases supporting the foregoing views, and upon the subject of town plats, dedications to public uses, wharfage, &c., see *Bowan's Executors* v. *Portland*, 8 B. Monroe, 232; *Barclay* v. *Howell's Lessee*, 6 Pet. 498; *Louisville* v. *Bank of U. S.*, 3 B. Monroe, 144; *Augusta* v. *Perkins*, Ib. 437; *Bowlinggreen* v. *Hobson*, Ib. 478; *Giltner* v. *Carrolton*, 7 Ib. 680; *Kennedy's Heirs* v. *Covington*, 8 Dana, 61. That a location on a river is sufficient evidence that the town extends to the water: see 2 J. J. Marsh. 224; and *ut supra*, 3 B. Monroe, 144; 7 B. Monroe, 680.

The petition for re-hearing is overruled.