G. M. REYNOLDS, Appellee, v. LYON COUNTY, Appellant.

County Bonds: LIMITATION OF INDEBTEDNESS. The issuance of re-
1    funding bonds in excess of the constitutional limitation, where the same are to be sold and the proceeds applied to the payment of those outstanding, even when so applied the indebtness would be reduced to an amount within the* limit, is in violation of Article II, Section 3 of the Constitution and such bonds are void.

Municipal Bonds: LIABILITY OF CORPORATION: CONSTITUTIONAL
2    LIMITATION. Where a municipal corporation obtains money from the sale of refunding bonds issued in excess of the constitutional limitation, and applies a portion of the same to the discharge of a valid indebtedness, an obligation of the county to the purchaser exists to the extent of the proceeds so applied, and if such indebtedness included with other valid obligations of the county exceeds the constitutional limitation, an issue of other and further refunding bonds is invalid.

Res Judicata:    Where the controling issue in a former action,
3    was, whether the issuance, sale of bonds and application of the proceeds to a valid indebtedness, created a debt within the provisions of the constitution, and is determined, it constitutes an adjudication of that question and is a defense to a subsequent action on the same bonds, between the same parties.

Res Judicata.,  Where the federal and state courts have concur-
4    rent jurisdiction, an adjudication by one is binding upon the other.

*Appeal from Lyon District Court.*—HON. F. R. GAYNOR,
Judge.

WEDNESDAY, OCTOBER 28, 1903.

ON April 5, 1880, the board of supervisors of Lyon county ordered the bonding of the floating indebtedness of the county, and on June 1st, following, the five bonds in amount of $500 each, bearing seven per cent. interest, payable semi-annually, were issued to Chase & Taylor to

take up outstanding warrants. These were transferred to the Equitable Life Insurance Company of Des Moines, and later by it to the plaintiff. Several defenses were interposed, but on hearing, judgment was entered for plaintiff, and the county appeals.—*Affirmed.*

*E. C. Roach* and *E. Y. Greenleaf* for appellant.

*Parsons & Riniker* for appellee.

LADD, J.—Lyon county was organized in January, 1872, and immediately proceeded to create an indebtedness, in utter disregard of section 3, article 11, of the state Constitution, which reads: "No county, or other political or municipal corporation, shall be allowed to become indebted in any manner, or for any purpose, to an amount in the aggregate exceeding five per centum on the value of the taxable property within such county or corporation —to be ascertained by the last state and county tax lists, previous to the incurring of such indebtedness." By July 28, 1873, it had issued judgment bonds to the amount of $55,000. Operations were then suspended until October 19, 1874, from which time up to June 4, 1879, funding bonds to the amount of $55,800 were turned out. On July 1, 1879, in pursuance of a resolution of the board of supervisors of April 3d previous, the county issued and sold bonds known as the "Shade Bonds," in the sum of $100,000, for the purpose of liquidating the outstanding bonded indebtedness of the county. Of the proceeds derived therefrom $53,500 was applied in satisfaction of the judgment bonds first mentioned, and the remainder to the payment of the $47,300 of the refunding bonds. Aside from the debts mentioned, twelve judgments were rendered against the county between July 24, 1873, and May 14, 1878, inclusive, but all these had been satisfied by the bonds referred to by cash or warrants, and no judgments were entered after the last-named date. Funding bonds were issued January 8, 1889, for $600; May 12, 1880,

$11,600; and June 1, 1880, $6,800.    Included in the last were the bonds in controversy.    On June 1, 1880, there were also outstanding $4,259 in county warrants.    It is unnecessary to detail subsequent transactions farther than to say that on May 1, 1885, there was an issue of $120,000 in bonds, from the proceeds of which the bonds of July 1, 1879, were fully paid.    The assessed valuation of the property of the county for each year is stipulated, and as a result of computation it appears that the maximum limit of indebtedness permissible June, 1880, was $49,517, and that the highest previous to that time was $54,067.80 in 1876.    It is manifest, then, that the bonds issued from October 19, 1874, to June 4, 1879, were void, for there were then outstanding those dated prior to July 28, 1873, which alone exceeded the constitutional limit.    Was the issue of July 1, 1879, also void?    This, according to appellant, is the crucial question in the case, for it will be observed that, if the $100,000 in bonds of that date be regarded valid, there was an outstanding indebtedness of $131,259, when the plaintiff's bonds were issued, and hence they were in excess of the limit fixed by the Constitution.    But, if such bonds were invalid, such indebtedness was but $31,259, and the county had authority to execute the bonds.    It is well to note that the bonds of July 1, 1879, were actually disposed of before the proceeds derived therefrom were applied on the bonds outstanding. This resulted during the time intervening in an additional indebtedness of $100,000, or double that amount in all.

Recurring to the article of the Constitution quoted, we observe that the county is prohibited from becoming indebted in any manner or for any purpose beyond the 1. County bonds: limit.    It may not then, incur any pecuniary limitation of indebedness. liability by bonds, notes, or by express or implied promises.    No purpose, however urgent or useful will suffice.    The existing indebtedness, if equal to the amount limited, is an insurmountable obstacle to the

creation of further debt in any manner or for any purpose. *Litchfield v. Ballou*, 114 U. S. 190 (5 Sup. Ct. Rep. 820, 29 L. Ed. 132). In *District Tp. of Doon v. Cummins*, 142 U. S. 366 (12 Sup. Ct. Rep. 220, 35 L. Ed. 1044), a statute of this state authorizing a school treasurer to sell bonds and "apply the proceeds thereof to the payment of the outstanding bonded indebtedness of the district," or exchange such bonds for outstanding bonds, was under consideration, and the court, in declaring the portion quoted contrary to the prohibition of the Constitution, said: "There is a wide difference in the two alternatives which this statute undertakes to authorize. The second alternative of exchanging bonds issued under the statute for outstanding bonds, by which the new bonds, as soon as issued to the holders of the old ones, would be a substitute for and an extinguishment of them, so that the aggregate outstanding indebtedness of the corporation would not be increased, might be consistent with the Constitution. But under the first alternative, by which the treasurer is authorized to sell the new bonds, and to apply the proceeds of the sale to the payment of the outstanding ones, it is evident that if [as in the case at bar] new bonds are issued without a cancellation or surrender of the old ones, the aggregate debt outstanding, and on which the corporation is liable to be sued, is at once and necessarily increased, and, if new bonds equal in amount to the old ones are so issued at one time, is doubled; and that it will remain at the increased amount until the proceeds of the new bonds are applied to the payment of the old ones, or until some of the obligations are otherwise discharged. It is true that, if the proceeds of the sale are used by the municipal officers, as directed by the statute, in paying off the old debt, the aggregate indebtedness will ultimately be reduced to the former limit. But it is none the less true that it has been increased in the interval, and that, unless those officers do their duty, the increase will be

permanent. It would be inconsistent alike with the words and with the object of the constitutional provision, framed to protect municipal corporations from being loaded with debt beyond a certain limit, to make their liability to be charged with debts contracted beyond that limit depend solely upon the discretion or the honesty of their officers."

In the dissenting opinion this construction was denounced as purely technical, as the object of the statute was, not to create a new or increase the old indebtedness, but merely to change its form, and reduce the interest rate. The difficulty in this suggestion is that a new debt is for the time-being created, and one day's continuation of it in addition to that evidenced by the old bonds is as much within the condemnation of the letter and spirit of the Constitution as that of a year. It won't do to say that officers may be relied upon to use the proceeds derived from the sale of bonds to wipe out existing obligations. In that case these were not so applied. The very object of this article of the Constitution is to protect the interests of the people against their own improvidence and extravagance. If such bonds are not within the prohibition, it would be within the power of dishonest officials by indirection to circumvent the fundamental law, and through diversion of the proceeds of new bonds saddle both them and the outstanding debts as burdens on the people. Said Corliss, C. J., in *Birkholz v. Dinnie*, 6 N. D. 514 (72 N. W. Rep. 931), in reaching a like conclusion: "Aware of the ingenuity with which restrictions on power are circumvented in great exigencies, the framers of our organic law employed the most sweeping language to prevent such devices being successful. The instrument declares that never shall the debt exceed the specified percentage of the assessed value. No matter for what purpose created, or under what circumstances, or how pressing the emergency, or how short the indebtedness is.

to continue, if it will in fact increase the obligations of
the municipality beyond the constitutional limit, it falls
within the letter and the spirit of the constitution.   To give
to section 183 so lax a construction that the debt limit may
be passed by the sale of refunding bonds is both dangerous
and unwarrantable.''   To the same effect, see, also, *State
v. McGraw*, 12 Wash. 544 (41 Pac. Rep. 894); *Bannock
Co. v. Bunting & Co.*, (Idaho) 37 Pac. Rep. 277.
Apparently opposed to these views will be found several
decisions: Thus, in *City of Los Angeles v. Teed*, 112 Cal.
327 (44 Pac. Rep. 580), in construing an article of the Con-
stitution like that in the last case cited, the court said:
''Merely to fund or refund an existing debt is not to incur
an indebtedness or liability.   A bond is not an indebted-
ness or liability.   It is only an evidence of representation
of an indebtedness.   And a mere change in the form of the
evidence of the indebtedness is not the creation of a new
indebtedness within the meaning of the Constitution.''
That was an action to compel the signing of bonds by the
proper officials.   The language quoted is not inconsistent
with the conceded power to exchange such new bonds for
outstanding obligations.   *Heins v. Lincoln*, 102 Iowa, 74.
That was the conclusion in the Opinion of the Justices, 81
Me. 602, (18 Atl. Rep. 291), and the other authorities cited.
See, also, *Powell v. City of Madison*, 107 Ind. 106 (8 N.
E. Rep. 31).

II.   Of the proceeds of the bonds issued July 1, 1879,
$53,500 were applied in payment of the $55,000 bonds
dated prior to July 28, 1873.   The assessed valuation

*2. MUNICIPAL*
bonds: liabil-
-ity of corpora-
tion: constitu-
-tional limita-
tion.

of the county in 1872 was $499,099.96, and
under the ruling of *Wilkinson v. Van Orman*,
70 Iowa, 230, this, rather than that of 1873,
must control.   Five per cent., thereof would
be $24,954.99, and to this extent the bonds were valid.
*McPherson v. Foster*, 43 Iowa, 48.   To this amount the
proceeds of the Shade bonds were applied in discharge of

a valid existing indebtedness of the county. If thereby an indebtedness in that sum was created against the county, its debt exceeded the constitutional limit when plaintiff's bonds were issued. The money of the bondholders was paid to Shade, the financial agent of the county for their sale, on the implied representation that they were valid, and, as said, at least $24,954.99 of it applied on its valid indebtedness. Had the Shade bonds been exchanged for the old bonds in the order of their issue, there could be no doubt of their validity. Or suppose the bondholders, instead of buying the Shade bonds, had intrusted the county officers with the money, and this had been made use of to discharge the $24,954 of debts created by the county. Can it be doubted that they might recover the amount advanced? Certainly it could not be claimed that this transaction would have increased the county debt, for it would merely be the exchange of one form of indebtedness to another. The fact that the bondholders were first induced to part with money for this identical purpose by the expectation of receiving valid bonds, and thereafter such money so appropriated can make no difference. The county obtained the money without consideration, and, in so far as it appropriated the same to the discharge of its valid indebtedness up to the constitutional limit, it was under the implied obligation to make restitution. During its retention by the county the bondholders might have laid claim to it at any time, and could have enforced its surrender by replevin. It was not appropriated until applied on the outstanding debt. By receiving and so applying it to the satisfaction of a valid existing debt, the county by implication undertook to repay to the extent of the limitation. Possibly a county may be estopped from denying the validity of bonds executed for refunding purposes, the proceeds of which are actually used in satisfying existing debts within the constitutional limit. Whether so might become important

upon interposition of the statute of limitations. We are concerned now only in ascertaining the extent of the indebtedness on June 1, 1880, regardless of whether evidenced by bonds or arising from implied obligations to pay. In either event the holders of the Shade bonds held a valid claim against the county at that time. See *Ætna Life Ins. Co. v. Lyon Co.* (C. C.) 82 Fed. Rep. 929; *Everett v. Ind. School Dist. of Rock Rapids*, (C. C.) 109 Fed. Rep. 697. The definition of debt was fully considered in *Swanson v. Ottumwa*, 118 Iowa, 161, and manifestly includes such an obligation as arose in this case. The prohibition is against becoming indebted in any manner. In *Ashuelot National Bank v. Lyon County* (C. C.) 81 Fed. Rep. 127, a different view seems to have prevailed, apparently on the ground of the uncertainty of a recovery on the Shade bonds in event of suit, and owing to their subsequent payment. We fail to understand how either of these considerations can be deemed controlling. If the obligation to pay existed June 1, 1880, the date of the bonds in suit, such obligation constituted a debt of the county; and whether a claim be thereafter asserted against the county, or the bonds are subsequently paid, is wholly immaterial. The question is whether there was an indebtedness at that time, and not the disposition subsequently made of it. The inconsistency of holding in favor of a recovery, as was done in *Ætna Life Ins. Co. v. Lyon County, supra*, and *Ætna Life Ins. Co. v. Lyon County*, 95 Fed. Rep. 325, and yet denying the right of the county to have such indebtedness declared valid and included as a debt in estimating whether the constitutional limit had been exceeded, is manifest. The form of the remedy available is entirely immaterial. The ultimate questions are, did an indebtedness on the part of the county arise out of the transactions by which the Shade bonds were issued, sold, and the proceeds applied on valid claims against the county; and, if so, did such indebtedness, with

other valid obligations of the county at the date of the bonds exceed five per cent. of the assessed value of the property of the county in 1878?    The first of these must be answered in the affirmative, and the last in the negative, and the result is that plaintiff's bonds must be declared void unless this has been obviated by a former adjudication.

III.    In March, 1895, this plaintiff brought suit in the federal court on certain coupons cut from the bonds sued on in this action, and also upon four bonds issued by the defendant county March 1, 1885.    Precisely the same defenses were interposed as in this case, save that of *res adjudicata*.    Before trial all of the defenses to the count of the petition based on the coupons, except that of the bar of the statute of limitations, were withdrawn.    As to the bonds, it was claimed on behalf of the county that the outstanding indebtedness when these were issued exceeded the constitutional limit.    The court in finding otherwise rejected the so-called "Shade Bonds" of July 1, 1879, as constituting an indebtedness.    The evidence conclusively shows that the point there directly in issue was whether, notwithstanding the invalidity of the bonds, the transaction of issuing and selling them, and the payment of a valid indebtedness of the county, created a debt against it within the meaning of the Constitution— precisely that which is the controlling question of this case. On this ground the plaintiff interposes the plea of former adjudication, and it must be sustained.    In the early case of *Haight v. City of Keokuk*, 4 Iowa, 199, in the course of the discussion, it was said that the matter pleaded in bar must have been included in the pleadings in the former suit.    But in *Carl v. Knott*, 16 Iowa, 379, it was held that: "The question to be determined is not whether the matter now in controversy was included in the issue joined in the former suit, but whether the judgment or determination was such as to estop the party from again claiming for the same demand. It would thus be included if it was covered

3.  RES JUDICATA.

by or embraced in the proceedings, and to be so embraced it is only necessary that it should always appear affirmatively from the face of the record." Again, in *Whitaker v. Johnson County*, 12 Iowa, 599: "The estoppel of a judgment extends to the whole matter in dispute in the cause in which it is rendered, and therefore to every point decided between the parties in the course of the proceedings which led to the judgment. The judgment itself is sometimes said to operate as the bar, and the decision of a particular issue as an estoppel; but the conclusive effect of both is the same, and depends on the same principle— that which has once been judicially determined shall not again be made the subject of judicial controversy." See, also, *Hahn v. Miller*, 68 Iowa, 745; *Shirland v. Union National Bank*, 65 Iowa, 96; *Davis v. City of Clinton*, 58 Iowa, 389; *Thomas v. McDonald*, 102 Iowa, 564. That the matter need not necessarily appear in the pleadings farther appears from *Goodenow v. Litchfield*, 59 Iowa, 226, where the rule is said to be settled "that, where a former judgment or decree is relied upon as a bar to an action, it must appear either by the record or by extrinsic evidence that the particular matter in controversy and sought to be concluded was necessary, tried, and determined in the former action." The expression in the *Haight Case* must, in the light of these subsequent decisions, be regarded as dicta, and the matter actually in issue, whether so indicated by the pleadings or not, when fairly adjudicated, may be pleaded in bar in a subsequent action between the same parties. The prevailing rule is so well expressed in Black on Judgments, section 614, that we quote with approval: "The doctrine of *res judicata* does not rest upon the fact that a particular propositon has been affirmed and denied in the pleadings, but upon the fact that it has been fully and fairly investigated and tried; that the parties have had an adequate opportunity to say and prove all that they can in relation to it; that the minds of court and jury

have been brought to bear upon it, and so it has been.
solemnly ,and finally adjudicated.   Now, these conditions
are fully met when any question, though foreign to the
original issue, becomes the decisive question—the turning.
point—in the case.   In that event it will recieve just as
full and exhaustive an examination as if it were the sole
subject-matter of a distinct and independent suit, and
therefore should be considered as much settled by the
judgment as if it stood alone as the issue in the case.  For.
these reasons the more correct doctrine is that the estop-
pel covers the point which was actually litigated, and.
which actually determined the verdict of finding, whether
it was statedly and technically in issue or not."     *Watson
v. Richardson*, 110 Iowa, 698; Bigelow on Estoppel, 90;
*City of New Orleans v. Citizens' Bank*, 167 U. S. 371 (17
Sup. Ct. Rep. 905, 42 L. Ed. 202).   In the former suit,
though other items of the county's indebtedness were in-
volved, the controverted question was whether the Shade
bonds, or the transaction by which they were issued, sold,
and part of the proceeds paid on valid debts of the county,
created an indebtedness against the county.   Precisely
the same question is raised in this action, and is equally
as controlling.   Having once been litigated by the parties,
it must be treated as *res adjudicata*.   Appellant suggests
these were merely matters of evidence, but it is apparent
that they establish an ultimate fact—that is, whether an
indebtedness was created by that transaction; and the
finding of the court was necessarily one of fact, and for
the purposes thereof the law applied must be accepted.
Bigelow on Estoppel, 100.   True, the court there held
that the evidence did not establish an indebtedness exceed-
ing the constitutional limitation, but in reaching that con-
clusion 'necessarily found as a fact that the transaction by
which the Shade bonds were disposed of and the proceeds
applied on a valid debt of the county did not raise an ob-
ligation on the part of the county to repay.   The law as

applied was incidental to this finding of fact, which we think constituted an adjudication of the precise question presented in this case.

It is also suggested that the former decree ought not to be sustained as an estoppel, because the bonds were issued to the residents of this state, and the federal court could not have acquired jurisdiction. It is sufficient answer to say that the record fails to show that the payees named in the bonds were residents of Iowa at the time they were executed or assigned, as contended. As the courts had concurrent jurisdiction over the matter in issue, the adjudication in one action was binding on the other. Black on Judgments, section 520.

4. RES JUDICATA.

There is nothing in the argument that one not a taxpayer ought not to be permitted to question the validity of the county's evidences of debt. The claim is, not that these were merely voidable, but that the county's obligations are the same as though such evidences of debt had never existed.

We reach the conclusion that the evidence of the former adjudication is conclusive, and that the judgment must be and is AFFIRMED.