GRANT, Receiver, v. The City of Davenport.

1. **Dedication:** WHARF: MUNICIPAL CORPORATION. The proprietor of lands, in laying out and platting the same, as an addition to an incorporated town, by the plat declared that "the streets, roads, alleys and public grounds, are donated, granted, appropriated to public purposes, for the uses therein specified;" but marked one tract which was bounded on three sides by public streets and on the fourth by a navigable river, by

lines which separated it from the streets, and by the words, "Reserved Landing." *Held*, that the donor retained the title and the right to use the tract so reserved for his own benefit, to the exclusion of the public.

—— The case of *McManus* v. *Carmichael*, 3 Iowa, 1, considered and distinguished; and *Cowles* v. *Gray*, 14 Iowa, 1, cited and followed.

2. Estoppel: CORPORATION. The proprietor, in platting an addition to an incorporated town, marked a certain tract of land bounded on one side by a navigable river, "Reserved Landing;" the council of the corporation, by ordinance, released to the owner, as to a portion of said land, "all right and claim of the corporation to control said property, or the use of any part thereof, further than the right of said corporation over any other private property within the limits of said corporation," which release was subsequently extended by ordinance to all of said property; after which, the said corporation authorized the erection of mills on said premises by the grantees of said owner, and also of a bulkhead to protect the landing thereon; and the county commissioners, in the exercise of a power conferred by law, declared said landing vacated as a part of the plat of said corporation; the grantees of the original owner thereafter erected mills and made other improvements on said premises, and remained in the use and possession of the same for a long series of years. *Held*, that said corporation was, by its own acts, estopped from denying the right of the owners of said "Private Landing" to its exclusive use.

*Argu.* 1. Corporation: PAROL CONTRACT. A release by a municipal corporation of a claim to the use of real property, by ordinance and not by deed, will be enforced by a court of equity when the releasee has paid the consideration, or entered into the possession and made valuable improvements.

3. Wharf: PRIVATE. When a private wharf was erected upon land within the limits of a municipal corporation, but which was not dedicated to the public use, the council of which was authorized by its charter "to regulate public wharves and landings, and to regulate the erection and repair of private wharves, and the rate of wharfage thereat," and also "to make wharves in the river, and to alter, widen, control, straighten and discontinue the same," under which it improved the public wharves, and permitted the improvement of such private wharf by the owners thereof at a heavy expense; and such owners remained in the undisputed possession of the same, using it with the public for a long series of years, asserting however their exclusive right where the necessities of their business demanded it, it was held that the corporation could not,

without compensation to such owners, appropriate to its own use the benefits of such wharf by demanding and receiving wharfage of the steamboats landing thereat.

4. —— RIPARIAN OWNERS. The riparian proprietor of land situated outside of an incorporated town or city has a right to erect private wharves or landings on the shores of navigable waters, if they conform to the State regulations (if any) and do not obstruct the paramount right of navigation; but wharves erected within the corporate limits of any town or city must yield to the paramount right of the corporation, when granted by the law by which the corporation is created.

5. —— POWER TO REGULATE. The power conferred upon a municipal corporation to regulate the repairs and rates of wharfage charged at a private wharf, does not confer the power to destroy them.

6. Receiver: GENERAL RULE. As a general rule, a receiver has no powers except those conferred upon him by the order of his appointment.

7. —— POWER CONSTRUED. When certain "mills and block" were committed to the care of a receiver, it was held, that he was thereby authorized to prosecute an action relating to a private wharf which was connected therewith, and which was primarily and principally constructed for the purpose of more conveniently carrying on said mills.

*Appeal from Scott District Court.*

MONDAY, APRIL 3.

IN 1861, an action was pending in the Scott District Court, in which Burrows & Prettyman were plaintiffs, and Cook & Sargent and others were defendants.

A part of the subject in litigation in that action was property known as "Burrows' Block and Mills." Plaintiff was appointed receiver of the rents and profits of said property, with power to rent and take charge, &c., and "to perform all other duties appertaining to his said office, and make full report to the court." Claiming that a wharf, or landing, in front of said "block and mills," was a part of the property thus placed under his control, plaintiff collected certain wharfage thereat, and the city, under an ordinance, by its wharfmaster, was proceeding to collect wharfage at the same wharf, and interfering with the right set up by plain-

tiff, when he filed this bill for the purpose of enjoining the city, and to have determined which was entitled to the money so received, and to the control of the revenue realized from time to time at said landing. After a full hearing on the issues joined, there was a decree for plaintiff, and defendant appeals.

*D. L. Shorey* for the appellant.

*Grant & Smith* for the appellee.

WRIGHT, Ch. J.—Antoine Leclaire obtained title to the property in controversy (or it is so claimed), by patent from the United States, of date November 1st, 1837, in accordance with a treaty made with the Sac and Fox Indians, of September 1st, 1832. In 1839 he laid out an addition to the town of Davenport, including block sixty-one. By the plat, he declares that the streets, roads, alleys and public grounds are donated, granted and appropriated to public purposes, for the uses therein specified. In front of block sixty-one, between Brady and Perry streets, and between Front street and the Mississippi river, was a tract of ground not laid off into lots, but marked with lines separating it from the street or levee, and designated as " Reserved Landing." Upon this Reserve, extending at one corner some feet below high-water mark, is the property known as "Burrows' Block and Mills;" and in front thereof, and connected therewith, running down to and below ordinary low-water mark, is the wharf, in relation to which this controversy arises. By deeds bearing date May, 1850, and prior thereto, the title to this "Reserved Landing," down to low-water mark, so far as it relates to the present controversy, had passed from Leclaire to Burrows and Prettyman. In 1846, the commissioners of Scott county ordered that one hundred and twenty-eight feet of this reserve should be vacated, being that part lying in front of lots

four and five in block sixty-one, and extending to low-water mark on the Mississippi river. On the 11th of April, 1848, they ordered that all of said "landing" should be vacated. In June, 1846, the town council of Davenport passed the following ordinance:

" WHEREAS, Antoine Leclaire, at the time of laying into town lots his second addition to the town of Davenport, as recorded in the recorder's office of the county of Scott, left out two certain lots of ground on the south side of Front street, in front of block sixty-one, * * * marked on the plat 'Reserved Landing;' and whereas, A. C. Fulton, by the consent of said Leclaire, proposes to erect upon a portion of said lots a steam-mill; and whereas, also, some doubts have been expressed as to the rights of said Leclaire and the corporation of the town of Davenport in and to such lots: Now, therefore, for the purpose of removing all doubts upon the subject,

" *Be it ordained by the Mayor and Aldermen of the Town of Davenport*, That, in consideration of the premises, and that said Fulton erect a mill thereon, as at present contemplated, all right, title, and interest and claim of said corporation in and to the following parcels of said tract of land, to wit (here follows a description of one hundred and twenty-eight feet in front of lots three and four, block sixty-one, and extending to low-water mark on the river), be, and the same is, hereby released and discharged to the said Antoine Leclaire, and also all right and claim that the said corporation may have to control the said property, or the use of any part thereof, further than the right of said corporation over other private property within the limits of said corporation."

In June, 1847, the town authorities passed a similar ordinance in relation to all the other ground included in said landing in front of block sixty-one. In 1849 the corporation authorized Burrows & Prettyman to erect a bulk-

head east of and above the mill and landing, to prevent injury thereto from ice, as far into the river as their improvements already extended. In 1846–7 Fulton built two mills, and since that time the "block" of buildings has been erected in the place of one of them which was torn down. About the same time the wharf was commenced, and on this Burrows & Prettyman, or those under whom they claim, have expended about $10,000. Prior to the erection of this there was no constructed wharf for the landing of boats, and since its erection it has been owned and controlled by the proprietors of the mills and block. It is here that the steamboats have principally landed. The proprietors have not charged wharfage, but Burrows & Prettyman were agents for many of the boats, and included (without naming it as such) the wharfage in their charges. Neither has the city charged or claimed to charge wharfage at this or any other place, until the passage of the ordinance hereinafter named. Burrows & Prettyman used this landing uninterruptedly for purposes connected with their mills and other business, but at the same time the public generally passed over and used it in receiving, delivering and taking away freight, and in all the methods common to such landings. Burrows & Prettyman, however, at times claimed the superior right, when their freights and other property accumulated so as to require the room. The landing is shown to enhance the value of the " mills and block," from the conveniences afforded in delivering and receiving flour and other freight, and for a part of the time the proprietors had a slide from their mills over the landing to move their flour to the boats. The city was never asked for authority to erect the wharf or extend the landing. The proprietors acted upon the supposition that they had this privilege by their deeds and the orders from the corporation and county authorities, and have accordingly claimed and treated it as their own, permitting the

public, however, to use it as above explained. In 1861, and after plaintiff was appointed receiver, the city passed an ordinance fixing the tariff of prices for landing boats at this and all the other public landings of the city, and in 1863 appointed the defendant (Watson) wharfmaster, by ordinance prescribing and declaring his duties. Plaintiff, after his appointment, demanded and collected wharfage, and the city wharfmaster insisted that boats landing at said wharf should pay to him. And to settle the rights of the respective parties, this proceeding was commenced.

In view of the above facts, we are very clear that 1. DEDICA- the city had no right to claim this wharfage. The TION: wharf: mu- right of plaintiff (as receiver) to collect the same, nicipal cor- poration. is a different question, which will be considered in due time. And this conclusion we reach, without, as we regard, militating in the least with the doctrine contained in *McManus* v. *Carmichael*, 3 Iowa, 1, and subsequent cases, which are claimed to be based upon it, and also without rendering it necessary to enter into an examination of the case of *Jones* v. *Soulard*, 24 How., 41, which it is suggested establishes a different rule as to the rights of riparian owners upon navigable streams from that announced by this court. The case is placed upon principles which do and should govern corporations, municipal and private, as well as individuals. If this controversy was between individuals, it seems to us that there could be no hesitation in settling their respective rights. And in the application of certain leading and well-recognized principles, corporations are alike bound with individuals. We know of no rule, no law, which gives to these artificial bodies immunity from being held to their contracts; which exempts them from a compliance with their obligations; which permits them at pleasure to interfere with or intrude upon the rights and property of the citizen. In addition to this we may remark that in the case relied upon (*McManus* v. *Car-*

*michael, supra*), it is expressly stated, that "this opinion need not preclude the idea that the adjacent owner may have some rights, between high and low water, which are even peculiar to himself and not common. Nor does it necessarily determine the question of the right to make wharves or structures for the convenience of navigation and commerce, and other questions of a similar nature. Nor are municipal powers affected; nor does it imply an unbounded license, on the other side, for every one to do what he pleases, even to the detriment of the owner, nor for an unlimited occupation of the shore. The maxim, *sic utere tuo ut alienum non lœdas*, still holds, and the powers of an action on the case, of indictment and injunction, still remain." And without these limitations, the writer of this opinion may be permitted to say, the case could never have received his approval.

We now come to the case before us. In the first place, we are not of the opinion that the tract of ground, marked "Reserved Landing," was intended by Leclaire to be appropriated to the public. He donates and grants "the streets, alleys and public grounds to public purposes." There were other public landings fronting on the river, other than that "reserved," to which, so far as a landing was concerned, the language could apply. And why use this language, if all were alike public? why separate it from that which was public by lines and marks, which, upon defendant's theory, are meaningless? Not only so, but why *reserve for the public* that which was already sufficiently appropriated without the use of such language? The proprietor had a clear right to make this or any other reservation. (*Cowles* v. *Gray*, 14 Iowa, 1.) If the language employed had been, "reserved for public landing," or "public landing," or the like, the attention would have been clear against the donor; and the fact that he did not thus make the claimed appropriation — a method not

unusual, and indeed we may say common — tends strongly to show the meaning of the reservation. Men ordinarily use language calculated to express the idea they mean to convey. And on arriving at this meaning, it is eminently proper to consider the circumstances surrounding them; the object designed to be accomplished, and the whole instrument in which it is found. And when we say that this was reserved for the public, we imply that the public was making the grant. But Leclaire, and not the public, · had the land, and he was laying out the town, and donating the streets, alleys and public ground. It is his expression — his language — and not that of the public. He says, this is a "reserved landing." Reserved by whom? By the public? Certainly not, for the public never had it. For the public? It is not so said. Suppose he had said "reserved," without adding the purpose, could it be claimed that it was, by such an act, given to the public? If not, no more can it in this case. Then again, we find all along the river below this reservation, that the landing is left open up to and including "Front or First street," showing most satisfactorily that *there* was to be the *public* landing, and that this tract was intended for the proprietor's own use and benefit. We have, therefore, an object to which the "public grounds," so far as they include the landing, may legitimately refer. We find language, not appropriate to convey the meaning insisted upon by the city, but entirely consistent with the idea of a private reservation, and feel clear in holding that the city did not, by the donation, acquire the right to this property as a landing. But, advancing one step further, the appellee's position becomes greatly strengthened.

Within a few years after this addition was laid out, while the matter was within the knowledge of the parties, and 2. ESTOP- before the property had enhanced in value, the PEL: cor- poration. city, by its constituted authorities, placed a con-

struction upon this supposed grant. Not only so, but then released and discharged "all right of title, interest and claim of said corporation in and to" said premises, to said Leclaire, and "all right and claim of the corporation to control said property, or the use of any part thereof, further than the right of said corporation over any other private property within the limits of said corporation." This was in 1846; and while this release or discharge only covered a part of the reservation, the city, the next year, released the balance by an ordinance even more explicit and conclusive than that from which we have just quoted. (See pages 169, 170, of city ordinances.) And it will be remembered that these releases extended to "*low-water mark.*" Following this, in 1849, the city empowered Burrows & Prettyman to erect an artificial bank or bulkhead to extend as far into the river as the improvements already made, for the purpose of protecting their property from injury by ice. Before this, the commissioners of the county, under the authority conferred by the act of February 15th, 1844, entitled, "an act to authorize the board of commissioners to vacate town plats," upon the petition of the owners of said "reserved" tract, vacated the same, and entered their action in the premises upon the proper records. And this order was, in due time, as required by law, recorded in the office of recorder of deeds. Based upon these several proceedings, releasing and vacating the property, and the title acquired from Leclaire, Fulton and his grantees, Burrows & Prettyman, proceeded in the erection of the contemplated mills, and made other and valuable improvements upon said premises; and thus enhanced, not only their value, but the property of all others in that vicinity, if, indeed, such improvements did not contribute materially to the growth and prosperity of the city. And during all this time, and for fifteen years afterwards, the city interposes no objection, but permits the improvements to progress,

Grant v. The City of Davenport.

the outlay of money to continue, and, in a word, suffers the parties to rely upon the validity of their title, and the releases thus voluntarily given, and fairly obtained. To allow the city now to question the right of these parties quietly to enjoy property thus acquired, it seems to us, would violate all ideas of justice and law.

It is said that the city (or town) could not thus release the property; that the corporation could only be bound *Argu.* 1. by deed duly executed under the corporate seal. CORPORA- Granting this for the purposes of the present case, parol con- tract. and it can make no difference. It must not be forgotten that we are in a court of equity. Action of the town council, of the character already quoted, or some similar authoritative act, was necessary to precede the execution of the deed. If so, such action, at least, is as binding upon the corporation as a parol agreement to convey would be upon an individual. Suppose that the occupants of the property had made a parol contract with an individual of the character above obtained from the city, or that they had obtained a parol license from Leclaire (upon the assumption that he owned the property) to enter upon the same and make these improvements. Even at law, these licensees, by proving their license and until it was revoked, could defeat any claim of the licenser for damages. We speak of cases, of course, where the contract has been executed to the extent of paying the consideration, taking possession, or making valuable improvements, and the like. And in equity, the vendor or licenser would be bound in conscience to carry it into execution; and the court would not only so decree, but would enjoin the vendor from interfering with the right thus acquired and secured. And see a strong case cited from 2 Eq. Cases Abr., 523, in Ang. on W. C., where one party stood by and saw his water-course diverted, but, instead of preventing it, encouraged the work, and afterwards brought his action at law, and where the

defendant on applying to a court of chancery obtained an injunction; and see also *Le Fevre* v. *Same*, 4 Serg. & Rawle, 241; *Williams* v. *Earl of Jersey*, 1 Craig & Phil. Ch., 87; *Whetmore* v. *White*, 2 Caines, 87; *Rerick* v. *Kern*, 14 Serg. & Rawle, 267; *Beatty et al.* v. *Gregory et al.*, 17 Iowa, 109.

In the light of this rule and these cases, the city is in no condition to gainsay the right of Burrows & Prettyman to occupy and enjoy this property. To allow this would ignore entirely the doctrine of estoppel (estoppels are said to be odious, but they frequently assist greatly in promoting justice), and allow parties to avoid their most solemn and fairly made contracts.

But, perhaps, it is said, this may be all true as to the "reserved landing" proper, and still there was no right to

3. WHARF: construct this wharf, and deprive the city of the
private. wharfage. Very much that has been said will apply with equal force to this part of the case. In its further examination, some additional facts in connection with the law applicable thereto may be stated. We have already seen that the grant by the city extended to *low* water mark. This wharf is, for the most part, between high and low water mark. That it may extend below ordinary low water, is not made to figure much, if any, in the case. The improvements, involving an expenditure of about $10,000, were made about the time of the building of the mills and the erection of the storehouses. They were made, also, under the same circumstances, so far as the knowledge and consent of the city were concerned. And they were likewise enjoyed and used in the same manner, or with a like knowledge and consent. The charter gives to the city the power " to improve and preserve the navigation of the Mississippi river within the limits of the city; to erect, repair and regulate public wharves and landings; to regulate the erection and repair of private wharves, and the rates of wharfage thereat." And by an amendment,

passed in 1857, the city council has power "to lay out public squares or grounds, streets, alleys, lanes or highways, and to make wharves in the river, and to alter, widen, control, straighten and discontinue the same." In 1856, the city declared, by ordinance, that it had no "suitable public steamboat landing," and provided for raising $25,000 for grading, improving and paving or macadamizing the levee, so as to make it good and suitable. At this time the wharf in question was being used by steamboats generally, and was, in the opinion of one of the witnesses, "the best landing between St. Louis and St. Paul." During all this time, as far as we can see from the ordinances, the city made no effort to interfere with the rights of those in possession. Indeed, there is nothing to indicate that the corporation undertook to regulate it in any manner. Burrows & Prettyman were in the undisputed possession and control, and doing all those things which the owners of any private wharf might or could do. It is true that the public passed over and enjoyed the use of this wharf, and yet there were times, when their business demanded, that Burrows & Prettyman asserted the superiority of their right, and this assertion was not controverted. It was built for the purpose of adding additional conveniences to their mills and stores, to assist in bringing to them trade, and making more profitable, because less expensive, their business. As they had the wharf, they procured the more readily the agency of steamers landing there, and thus, without charging wharfage specifically, they obtained some compensation for their expenditure. Now the question is, shall the city, by an ordinance passed in 1861, step in and take to itself the benefits arising from this erection, so far as to demand and receive the wharfage for boats landing thereat. In other words, can a corporation, without rendering due compensation, thus interfere with the rights of these parties, rights acquired with the

knowledge of said corporation, and based upon a contract made with its constituted authorities? In thus stating the proposition, we do not forget that the proprietors did not ask for authority to erect the wharf or extend the landing. Neither did they, to erect any of the buildings on the "reserved landing," other than the mills. Not only so, but the grant was to low water mark, and this work was commenced, with the knowledge of the city, soon after obtaining the same. It is manifest that the proprietors, as they state, acted upon the supposition, that they had this right by their deed and the orders from the corporation and county authorities. And they were allowed to act upon this supposition, without objection from the party that now contests their right. *Wendell* v. *Van Rensselaer*, 1 Johns. Ch., 344; *Lucas* v. *Hart*, 5 Iowa, 415; *Adams* v. *Rockwell*, 16 Wend., 285, reversing *S. C.*, 6 Id., 467; *McCormick* v. *Barnum*, 10 Id., 105; *Jackson* v. *Gardner*, 8 Johns., 394; *Same* v. *Van Corlaer*, 11 Id., 123.

In thus holding, it must be borne in mind that this wharf 4. —— ripa- does not interrupt nor interfere with the free rian own- ers. navigation of the river. On the contrary, it assists rather than obstructs. Nor is it necessary to insist that either the right of soil or the right of the public easement, in any part of the river itself, was granted to plaintiff or those represented by him. We entertain no doubt as to the right of the riparian proprietor (outside of any incorporated city or town) to erect wharves or landing places on the shores of navigable waters, if they conform to State regulations (if any), and do not obstruct the paramount right of navigation. This right is expressly recognized in *Dutton* v. *Strong*, 1 Black, 1, and we can find no case to the contrary. If the proprietor's land is within the limits of an incorporated town or city, his right must yield to the paramount right (when this right is given by the law of its creation) of the corporation to build, erect

and regulate the wharves and landings. But the city may authorize or permit the erection of private wharves, and those thus erected can no more be destroyed than if erected by a proprietor where no such license was neces-sary. In this case, we have seen, the charter authorizes the city to regulate the erection and repair of private wharves, and the rates of wharfage thereat. Under this power, the city may *regulate,* but not destroy — may exercise control, as over other private property within its limits, but not to the extent of appropriating the use and enjoyment thereof to the public without compensation. And it is no answer to this to say, that the city does not propose to take the property for public use, but merely to take the wharfage from boats landing thereat. The man who enters upon my land, and demands and receives rent from my tenant, might as well be heard to say he did not trespass upon my property or rights.

There is an old rule which declares, "that he who receives the benefit must take the burden." And it is equally true, that he who takes the burden ought to receive the benefit. If this is a public wharf, and it was competent at any time for the city to control and demand wharfage thereat, then it ought to take it with all its burdens. And yet it is not difficult to believe that, if boats had been injured because of defectiveness in the construction of the wharf, or an individual in his person or property, because it was not in proper repair, the city, if sued for such injuries, would have readily discovered the private character of such erection. Or if made liable in the first instance because of its duty to regulate the repair of such private structure, a remedy over against the proprietors would as readily have suggested itself.

The case of *Haight* v. *The City of Keokuk,* 4 Iowa, 199, is referred to and relied upon by appellant's counsel. That case, for the most part, involved a question of former adju-

dication. But, in so far as it discusses any principle involved in the present case, its facts are so different that it cannot be claimed as authority. We are by no means to be understood as holding that defendant has not the right (as trustee for the public) to the use of Front or Water street, to its full width to the river, and that, by virtue of its municipal authority, it may not erect thereon wharves, or do anything else, to carry out the purposes manifestly intended by its charter. Nor do we hold that the city might not have. erected a wharf upon this very ground, and collected and controlled the wharfage thereat. But, having consented to, and acquiesced in, the erection of a private wharf, and permitted those erecting it to continue in the undisturbed use and enjoyment of it for about fifteen years, the city cannot, at its pleasure, divest them of the right thus acquired. And see *Muscatine* v. *Hershey, ante.*

Secondly, and briefly, as to the right of plaintiff to bring 6. RECEIV- this action. And the point here made simply ER: general rule. involves a construction of the order made appointing the receiver, and the power thereby conferred. We recognize the general rule, that, as receiver, plaintiff has no powers except such as were conferred upon him by the order for his appointment. "Subject to the control of the court, a receiver has power to bring and defend actions, to take and keep possession of property, to collect debts, to receive the rents and profits of real property, and generally to do such acts, in respect to the property committed to him, as the court may authorize." Rev., § 3421.

The court below having found that the plaintiff, as 7. —— pow- receiver, duly appointed, was authorized to bring er con- strued. the suit, the question is, whether, within the language conferring the power, *this property* was *committed* to his care and control. That the "mills and block" were thus committed, there is no room for doubt. Does this language cover and include the wharf, or landing, as a part

of the property? It seems to us that it does. The testimony satisfies us that this wharf was constructed, primarily and principally, for the purpose of more conveniently carrying on and transacting the business contemplated on the erection of the buildings. From this they derive no inconsiderable part of their value, as mills and rooms for the sale and storage of goods.

It is, in effect, all one property, being known by the name given to it in the order of appointment, as much so as the ground surrounding and belonging to a residence, or the yards connected with a mill or railroad depot. In other. words, the receiver was directed to take and control this property, as the debtors might or could do, holding it and renting it for the benefit of the parties interested in the subject-matter of the litigation. And this charge he was to exercise, not over half of it merely, but over all that which constituted, fairly and equitably, the property covered by the lien of the creditors.

Affirmed.