# UNITED STATES v. ILLINOIS CENTRAL RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 331. Argued March 29, 30, 1894. — Decided May 26, 1894.

Under the operation of the act of the legislature of Illinois of February 27, 1833, for the making and recording of town plats, the interest in and control of the United States over the streets, alleys, and commons in the Fort Dearborn addition to Chicago ceased with the record of the plat thereof and the sale of the adjoining lots.

When a resort is made by individuals, or by the government of the United States to the mode provided by the statute of a State where real property is situated, for the transfer of its title, the effect and conditions prescribed by the statute will apply, and such operation will be given to the instrument of conveyance as is there designated.

THIS was an appeal from a decree of the Circuit Court, sustaining a demurrer on the part of the Illinois Central and the Michigan Central Railroad, to an information filed by the United States, and dismissing the information as to all the appellees. The information sought to restrain the appellees from diverting the public ground marked on the plat of the Fort Dearborn addition to the city of Chicago from the easements to which it was dedicated. On this branch of the case the information proceeded upon the theory that the United States being the owners of the land in question, and having dedicated it to certain public purposes, were entitled to enjoin its diversion from those public purposes to private uses. The bill alleged:

That before and on the 7th day of June, A.D. 1839, the United States possessed and owned in fee simple the southwest fractional quarter of section 10, the same being a reservation out of the public domain, called the Fort Dearborn reservation; and the then Secretary of War having directed that reservation to be sold, the same was thereupon by his authority laid off into blocks, lots, streets, alleys, and public ground, as an addition to the municipality aforesaid, called the Fort Dear-

born addition to Chicago; and on the day last above mentioned a plat thereof was made and acknowledged by one Matthew Birchard as agent and attorney of the said Secretary of War, and was thereupon duly recorded in the recorder's office of the said county of Cook; on which plat a part of the ground therein comprised, being all that part between Lake Michigan, on the east, and blocks 12 and 15 (as shown by the plat) on the west, was designated as "public ground, forever to remain vacant of buildings," and there was a further declaration that "the public ground between Randolph and Madison streets, and fronting upon Lake Michigan, was not to be occupied with buildings of any description;". as by a plat therewith filed more fully and distinctly appeared. And afterward the several lots designated and shown on that plat were sold and conveyed by the United States to divers persons, by and according to the plat and with reference to the same; but the United States never parted with the title to the streets, alleys, and public ground in the said plat designated and marked, and still own the same in fee simple, with the rights and privileges, riparian and otherwise, pertaining to such ownership, subject to the use and enjoyment of the same by the public.

The bill further alleged a grant of right of way to the Illinois Central Railroad, under an act of the State of Illinois, approved February 10, 1851, which provided, however, that nothing in that act contained should authorize the said corporation to make location of its tracks within any city without the consent of the common council of such city.

The bill further alleged that the common council of the city of Chicago, by an ordinance dated June 14, 1852, gave the Illinois Central Railroad Company the right to enter upon and use for the purpose of its said railroad and works a space 300 feet wide, for the whole length of the public ground shown in the plat of the Fort Dearborn addition, and that the railroad company, having accepted said act of the legislature and said ordinance, by virtue and under color of the same proceeded to and did build its said railroad and extend and complete the same from the southward into the said city, on the course indicated in the said ordinance, to

a terminus near the Chicago River aforesaid; and the said company has ever since maintained and operated its said railroad, and continues so to do. And the said District Attorney for the United States says that no authority or license was ever given by the United States for building or maintaining or operating its said railroad upon or along . . . said public ground shown on said plat of Fort Dearborn addition, or any part of those tracts of ground; that the General Assembly of the State of Illinois passed an act on April 16, 1869, whereby it assumed and attempted, among other things, to grant in fee to the said Illinois Central Railroad Company, etc., . . . all the right and title of the State of Illinois in and to the lands submerged, or otherwise, lying north of the south line of Monroe Street, and south of the south line of Randolph Street, and between the east line of Michigan Avenue and the track and way of the said Illinois Central Railroad, the said pretended act purporting to grant the said grounds for a passenger station and other railroad purposes, and providing that the said railroad companies named as grantees should pay to the city of Chicago the sum of $800,000 . . . ; that the said Illinois Central Railroad Company, etc., . . . now give out and claim that the said pretended act was and is a legal and binding act, and passed to them respectively a valid title to the property in and by the same attempted to be granted; and the same companies now claim the right and threaten to take possession and exclusive control of the property so in and by the said pretended act attempted to be granted to them respectively.

Thus the information showed that the railroad companies named claimed title to that portion of the public ground shown on the plat of the dedication of the Fort Dearborn addition lying east of Michigan Avenue, and threatened to take possession and exclusive control thereof, for the purpose of appropriating it to a passenger station and other railroad purposes.

*Mr. Solicitor General* for appellants.

I. The Birchard plat of the Fort Dearborn addition to the

city of Chicago did not divest the United States of the fee in the public ground for the following reasons:

1. The act of March 3, 1819, c. 88, 3 Stat. 520, under which the Secretary of War acted, while it probably conferred authority upon him to lay out streets and alleys as fairly incidental to the power " to sell," which power alone was conferred upon him in terms, did not authorize him to convey away the fee of a large tract to be used as a public ground. By the language of the act it was only " on the payment of the consideration" that the Secretary was authorized " to make, execute, and deliver all needful instruments, conveying and transferring the same in fee."

2. The town-plat act of Illinois, of February 27, 1833, Revised Laws of Illinois, 1833, 599, provides only for cases in which " any county commissioners or other person or persons wish to lay out a town." The United States are not fairly within the description of " person or persons," and a plat made by or on behalf of the United States is not within the terms of the act. Note the penalties prescribed by sections 8 and 9, to which the United States could not be subject.

3. The act of Congress under which Fort Dearborn was sold authorized the Secretary of War " to cause to be sold " and " to make, execute, and deliver all needful instruments, conveying and transferring the same in fee," so that, if the Illinois statute covers this plat at all, the Secretary of War must be deemed to be " the person " who is authorized by its first section " to lay out " the addition, and " the person " who is required under the fourth section to acknowledge the plat before one of the judicial officers named. It has been held that the statute does not authorize a plat to be made or acknowledged by an agent or attorney in fact. *Gosselin* v. *Chicago*, 103 Illinois, 623, 626. Only stone planting can be done through an agent. Ib. 626. The attempt of the Secretary of War to act through an agent and attorney was therefore ineffectual to accomplish a *statutory* dedication, assuming all the other requirements of the statute to have been complied with.

4. But if the Secretary of War could act through an attorney

in fact, it was necessary to the validity of his power of attorney that it should be recorded under section sixteen of the " Act concerning conveyances of real property." Rev. Stat. Ill. 1833, 135, quoted in 103 Illinois, 627. Birchard's power of attorney does not appear to have been recorded.

5. Section 1 of the Illinois act requires the plat or map of the addition, and also the survey itself, to be made by the county surveyor. See also section 10 providing for his fees. On the Birchard plat the county surveyor certifies " that the foregoing field notes of the same [plat] are correct as done by me immediately preceding the date hereof," but he does not certify that either the survey or the plat were made by him.

6. Section 4 requires that the surveyor, as one of " every person or persons whose duty it may be to comply with the foregoing requirements," shall acknowledge the plat before one of the judicial officers named. No such acknowledgment was made by the county surveyor.

7. Section 4 requires that the plat or map shall be certified not only by the surveyor but by the county commissioners. It is suggested by counsel for the appellees that " and " in this section should be read " or." No decision is cited to support that contention. The same language requiring both the surveyor and the county commissioners to certify the plat is found in the Revised Statutes of Illinois, 1845, p. 115, c. 25, § 20, and in statutes of Illinois, 1869, (Gross's ed.,) c. 25, div. 1, § 20. The object of the statute in requiring the certified approval of the county commissioners to the plat is obvious, otherwise it would be left to the option of individuals to lay out such additions to towns as they saw fit. Section 4 also requires, I submit, that the county commissioners shall acknowledge the plat before one of the judicial officers named. The Birchard plat contains neither the certificate of the county commissioners, nor the acknowledgment of the county commissioners required by this section.

II. If either of the foregoing points is well taken, the fee of the United States in the public ground has not been divested, for it has been held repeatedly that a dedication which does not conform to the requirements of the statute

does not divest the fee of the owner in streets and public grounds, but operates only as a common law dedication. By the express terms of section 5 it is only plats "when made out and certified, acknowledged, and recorded, as required by this act," that are effective to vest the fee. *Banks* v. *Ogden*, 2 Wall. 57; *Gosselin* v. *Chicago*, 103 Illinois, 623, 625; *Manly* v. *Gibson*, 13 Illinois, 308, 312; *United States* v. *Illinois Central Railroad*, 2 Bissell, 174, 177.

The information admits that the United States have made a common law dedication — in other words, that although the United States are the owners of the fee in the public ground, they are estopped to prevent its use as public ground, or themselves to occupy it with buildings. But that is the extent of the estoppel or of the easement which they have granted, and as the owners of the fee, subject to such easement, they are clearly entitled to an injunction to prevent others from occupying it with a depot or other buildings.

III. But if the court holds that the plat is good as a statutory dedication, so as to vest the fee of the public ground in the city of Chicago, section 5 of the Illinois statute declares that such fee "shall be held in the corporate name thereof, in trust to and for the uses and purposes set forth and expressed or intended." The Supreme Court of Illinois has held, in *Zinc Company* v. *La Salle*, 117 Illinois, 411, that the fee so vested is a base or determinable fee, and that upon the entire and permanent abandonment of the easement the property reverts to the dedicator.

I submit that the United States, not only as donors of the trust, but in view of the possibility of reversion, may maintain this bill to restrain an abuse of the trust and to prevent an occupation of the grounds with the buildings, even if they have parted with the fee. One who dedicates property to public uses is entitled in a court of equity to enforce the trusts declared by the dedication, whether he accompanied the dedication with a transfer of the fee to the municipality or retained the fee in himself.

*Warren* v. *Lyons City*, 22 Iowa, 351, 355, is a case in which the fee of a public square had vested in the city. The suit

was brought by the dedicator to enjoin the municipal authorities from selling the square or otherwise diverting it to uses and purposes foreign to those for which the dedication was made. The court said :

For the use contemplated, they may have parted with the fee — the "proprietary right," but not for all purposes; and, therefore, if the city authorities, as the claimed trustee of the public, should undertake to make gain by the sale, or to authorize its use for anything else but a "public square," they violate the trust, and the original owners, in virtue of the terms of the grant, may demand that the trust shall be executed in good faith, and restrain any such proposed violation of the terms upon which the grant was accepted.

Nothing can be clearer than that if a grant is made for a specific, limited, and defined purpose, the subject of the grant cannot be used for another, and that the grantor retains still such an interest therein as entitles him in a court of equity to insist upon the execution of the interest as originally declared and accepted.

In *Barclay* v. *Howell's Lessee*, 6 Pet. 498, 507, Mr. Justice McLean, in denying the right of the dedicator to recover in ejectment, said :

If this ground had been dedicated for a particular purpose, and the city authorities had appropriated it to an entirely different purpose, it might afford ground for the interference of a court of chancery to compel a specific execution of the trust, by restraining the corporation, or by causing the removal of obstructions.

In *Hardy* v. *Memphis*, 10 Heiskell, 127, 128, where the original proprietors sought to recover land, first, because not dedicated, and second, if dedicated, because the use was claimed to have been abandoned, the court said a misuse of the land did not work a forfeiture, " nor entitle the original proprietors to any relief except, upon a bill properly filed, to have the buildings obstructing the proper use removed."

IV. The United States seek to maintain this suit, not in the exercise of sovereignty or of governmental or police control, but solely by virtue of their title in and ownership of land,

just as any private owner might do. Fort Dearborn was land which the United States owned in propriety and could dispose of as Congress saw fit, and with respect to it, therefore, the United States are in the position of a private owner; and if a private owner, having dedicated the public ground, might maintain this bill, the United States can do so.

The distinction between the case at bar and the case of *New Orleans* v. *United States*, 10 Pet. 662, 736, is clearly recognized by Mr. Justice McLean in the following passage in his opinion: " If the common in contest, under the Spanish crown, formed a part of the public domain or the crown lands, and the king had power to alien it, there can be no doubt that it passed under the treaty to the United States, and they have a right to dispose of it, the same as other public lands. But if the King of Spain held the land in trust, for the use of the city," etc.

Neither that case nor *Pollard's Lessee* v. *Hagan et al.*, 3 How. 212, relate to land which the United States ever held as property, with power to sell as part of the public domain.

In *New Orleans* v. *The United States*, 10 Pet. 662, relief was denied the United States upon the ground that the King of Spain had not power to alienate the public levee in New Orleans, that the treaty did not pass the title to the United States, and that the Federal government did not succeed to the limited police jurisdiction, which had been exercised by the King of Spain to regulate the use of the quay; in other words, that the United States never were owners of the quay; whereas at bar we have an abandoned military post, held as the property of the United States and sold and dedicated by them as such.

In *United States* v. *Chicago*, 7 How. 185, 194, this court recognized the right of the Federal government to hold the very land in question as a *mere proprietor*. The government is not claiming any municipal power or control over this public ground; but only the rights concerning it that an ordinary person would have, asserting merely the legal rights which grow out of its ownership as a proprietor.

*Mr. Benjamin F. Ayer* for the Illinois Central Railroad Company, appellee.

*Mr. John S. Miller* for the City of Chicago, appellee.

MR. JUSTICE FIELD delivered the opinion of the court.

This is an appeal on the part of the United States from a decree of the Circuit Court sustaining a demurrer to an information or bill in equity, in which they were complainants and the Illinois Central and other railroad companies were defendants. The information charges that encroachments are made or threatened upon property of the United States, and the object of the information, so far as contended on the present appeal, is to prevent their continuance in the future, as to one particular parcel of property and to preserve it open to the uses for which it was dedicated by the United States. That property consists of land situated on the shore of Lake Michigan, being part of fractional section ten in Chicago, lying between Lake Michigan on the east and block twelve of the plat of Fort Dearborn addition to Chicago on the west.

The several parties named as defendants appeared to the information, and the Illinois Central Railroad Company and the Michigan Central Railroad Company demurred to it on the ground that it does not state such a case as entitles the United States to the relief prayed for, or show any right of interference on their part, either in law or in equity, respecting the matters referred to, or allege any violation, contemplated or threatened, of any right, legal or equitable, of the United States.

Upon the hearing of the several cases known and spoken of together as the *Lake Front case*, before the Circuit Court of the United States at Chicago on the 23d of February, 1888, this demurrer was argued, and was sustained, "except as to that part of the information which alleges, in substance, that the Illinois Central Railroad Company claims the absolute ownership of, and threatens to take possession of, use and occupy the outer harbor of Chicago," the opinion of the court

being "that the general government, upon the showing made
by it, has no title to any of the streets or grounds described
in said information, and has no standing in court, except so
far as it seeks to protect the said harbor against obstructions
that would impair the public right of navigation, or interfere
with any plan devised by the United States for the develop-
ment or improvement of the outer harbor." 33 Fed. Rep.
730. Afterwards, on the 23d of August, 1890, the attorney
of the United States was granted leave to amend the infor-
mation by striking out whatever related to the outer harbor
and the encroachments alleged to have been made, or threat-
ened in the navigable waters of the lake; and, at the same
time, an order was entered by the district judge sustaining
the demurrer to the information as amended, and directing
that it be dismissed, "without prejudice to the United States,
however, to hereafter institute any appropriate action or pro-
ceedings for the purpose of enforcing any rights they may
have in the navigable waters of the lake or outer harbor of
Chicago;" and thereupon an appeal was prayed and allowed
to the Supreme Court.

From the decree of the Circuit Court in the *Lake Front
case*, rendered in February, 1888, appeals were taken to the
Supreme Court of the United States by the Illinois Central
Railroad Company and the city of Chicago, and they were
argued and decided at its October term, 1892. *Illinois Cen-
tral Railroad* v. *Illinois*, 146 U. S. 387. The United States
did not appear and participate in the argument on the appeal.
As they were never a party to those suits in the court below
and never appealed from the decree, they were dropped as a
party in the designation of the title of the case. The ques-
tions involving the title and right of the parties embraced in
the cases, considered under the general designation of the
*Illinois Central Railroad Company* v. *State of Illinois*, to the
navigable waters of the harbor of Chicago and in the Lake
Front property, and the encroachments on the harbor by the
railroad company, and the validity of the act of April 16,
1869, granting submerged lands in the harbor, were fully
considered and settled as between the State and the city of

Chicago, on the one part, and the Illinois Central Railroad Company on the other.

The appeal now before the court is the one taken by the United States from the decree of the Circuit Court rendered on the 23d of August, 1890, sustaining the demurrer to the information. The amendment allowed to the information consisted in striking out that part to which the demurrer was not sustained, and was made in order that the demurrer might go to the entire information. The only contention now urged by the Solicitor General, on behalf of the appellants, is that the information is good to the extent that it seeks to restrain the appellees from diverting the public ground designated as such, on the plat of the Fort Dearborn addition to the city of Chicago from the supposed public easement to which it was dedicated. The Solicitor General states that on this branch of the case the information proceeds upon the theory that the United States, being the owners of the land in question, and having dedicated it to a public purpose, are entitled to enjoin its diversion from that public purpose to private uses. It will, therefore, be unnecessary for the disposition of the appeal to consider any other position originally taken by the United States in the information.

As early as 1804 a military post was established by the United States south of Chicago River, upon the southwest fractional quarter of section ten, and was subsequently occupied by troops until its sale many years afterwards. In 1819 Congress passed an act authorizing the sale by the Secretary of War, under the direction of the President, of such military sites belonging to the United States as may have been found or had become useless for military purposes. And the Secretary of War was authorized, on the payment of the consideration agreed upon into the Treasury of the United States, to execute and deliver all needful instruments conveying the same in fee. And the act declared that the jurisdiction which had been specially ceded to the United States for military purposes, by a State, over such site or sites should thereafter cease. Act of March 3, 1819, c. 88, 3 Stat. 520. Subsequently, in 1824, upon the request of the Secretary of War, the south-

west quarter of this fractional section ten, containing about fifty-seven acres, and on which Fort Dearborn was situated, was reserved from sale for military purposes by the Commissioner of the General Land Office. The land thus reserved continued to be used for military purposes until 1837. In that year, under the direction of the Secretary of War, it was laid off by his authority into blocks, lots, streets, alleys, and public ground, as an addition to the municipality of Chicago, and called the "Fort Dearborn addition to Chicago," and in June, 1839, a plat thereof was made and acknowledged by his agent and attorney and recorded in the recorder's office of the county of Cook. On that plat a part of the ground situated between Lake Michigan on the east and block twelve on the west is designated as "public ground forever to remain vacant of buildings." [146 U. S. 392, Map A.] It bears also a further declaration in these words, viz. : "The public ground between Randolph and Madison Streets and fronting upon Lake Michigan is not to be occupied with buildings of any description." Subsequently, and for some years, several lots designated and shown on the plat were reserved from sale and remained in the military occupation of the government, but eventually, in 1845, or soon afterwards, all of them were sold and conveyed by the United States to divers persons "by and according to said plat and with reference to the same."

The statute of Illinois of February 27, 1833, then in force for the making and recording of town plats, (Rev. Stat. of Ill. § 833, p. 599,) provided that every donation or grant to the public, marked or noted as such on the plat, should be deemed in law a sufficient conveyance to vest the fee simple title, and that "the land intended to be for streets, alleys, ways, commons, or other public uses, in any town or city, or addition thereto, shall be held in the corporate name thereof in trust to and for the uses and purposes set forth and expressed or intended." The plat in such cases had all the force of an express grant and operated to convey all the title and interest of the United States in the property for the uses and purposes intended. *Zinc Company* v. *La Salle,* 117 Illinois, 411, 414, 415 ; *Chicago* v. *Rumsey,* 87 Illinois, 348 ; *Gebhardt* v.

*Reeves,* 75 Illinois, 301 ; *Canal Trustees* v. *Havens,* 11 Illinois, 554.

It is stated in the information that the United States never parted with the title to the streets, alleys, and public grounds designated and marked on the plat, and that they still own the same in fee simple " with the rights and privileges, riparian and otherwise, pertaining to such ownership, subject to the use and enjoyment of the same by the public."

But we do not think this position is tenable. A title to some of the streets may have continued in the government so long as the title to any of the adjoining lots remained with it, but not afterwards without disregard of the statutory regulations of the State and its provisions for the transfer of the title. When a resort is made by individuals or the government to the mode provided by the statute of a State where real property is situated, for the transfer of its title, the effect and conditions prescribed by the statute will apply, and such operation given to the instrument of conveyance as is there designated. The language of the statute is clear, " that the land intended for streets, alleys, ways, commons, or other public uses in any town or city or addition thereto shall be held in the corporate name thereof, in trust to and for the uses and purposes set forth and expressed or intended."

The interest in and control of the United States over the streets, alleys, and commons ceased with the record of the plat and the sale of the adjoining lots. Their proprietary interest passed, in the lots sold, to the respective vendees, subject to the jurisdiction of the local government, and the control over the streets, alleys, and grounds passed by express designation of the state law to the corporate authorities of the city.

In 1854, the validity of the survey and plat made of Fort Dearborn reservation was recognized by Congress in an act for the relief of one John Baptiste Beaubien, Act of August 11, 1854, c. 172, 10 Stat. 805, by which the Commissioner of the General Land Office was authorized to issue a patent or patents to Beaubien for certain lots designated and numbered on the survey and plat of the Fort Dearborn addition to Chicago,

made under the order of the Secretary of War. And it is averred, as already stated, in the information that all the lots were sold and conveyed by the United States to divers persons " by and according to the said plat and with reference to the same."

It was the intention of the government to have a plat made conformably to the provisions of the statute, and it is plain, from its inspection, that all the essential requisites were followed. Nor is any reason suggested why a different effect should be given to the plat and its record in this case from that of similar plats made and recorded by other land proprietors. And if, as we have already said, the government, charged with the duty of disposing of a tract of public land within a State, chooses to proceed under the provisions of a particular statute of that State, it is clear that the same legal effect should be given to its proceeding as in case of an individual proprietor. The effect of the recording of the plat in this case was therefore to vest in the city of Chicago the legal title to the streets, alleys, and public ground in Fort Dearborn addition, and after its execution and record and sale of the abutting property the United States retained no interest in them, legal or equitable. That interest was as completely extinguished as if made by an unconditional conveyance in the ordinary form.

Again, the sale of the lots was, in law, an effectual dedication of the streets and public grounds for municipal uses, and, as observed by counsel, the purchasers of the lots acquired a special interest in the streets and public grounds on which their lots abutted, and the United States could make no disposition of them after the sale inconsistent with the use to which they had been dedicated.

The only parties interested in the public use for which the ground was dedicated are the owners of lots abutting on the ground dedicated, and the public in general. The owners of abutting lots may be presumed to have purchased in part consideration of the enhanced value of the property from the dedication, and it may be conceded they have a right to invoke, through the proper public authorities, the protection

of the property in the use for which it was dedicated. The only party interested, outside of abutting owners, is the general public, and the enforcement of any rights which such public may have is vested only in the parties clothed with the execution of such trust, who are in this case the corporate authorities of the city, as a subordinate agency of the State, and not the United States.

The United States possess no jurisdiction to control or regulate, within a State, the execution of trusts or uses created for the benefit of the public, or of particular communities or bodies therein. The jurisdiction in such cases is with the State or its subordinate agencies. The case of *New Orleans* v. *The United States*, 10 Pet. 662, furnishes an illustration of this doctrine. In that case the United States filed a bill in the District Court for an injunction to restrain the city of New Orleans from selling a portion of the public quay, or levee, lying on the bank of the Mississippi River in front of the city, or of doing any other act which would invade the rightful dominion of the United States over the land or their possession of it. The United States acquired title to the land by the French treaty of 1803. By it Louisiana was ceded to the United States, and it was shown that the land had been appropriated to public uses ever since the occupation of the province by France. It was contended that the title to the land, as well as the domain over it during the French and Spanish governments, were vested in the sovereign, and that the United States by the treaty of cession of the province of Louisiana had succeeded to the previous rights of France and Spain. The land and buildings thereon had been used by both governments for various public purposes. The United States had erected a building on it for a custom-house, in which, also, their courts were held.

It was argued on behalf of the city that the sovereignty of France and Spain over the property, before the cession, existed solely for the purpose of enforcing the uses to which it was appropriated, and that this right and obligation vested in the State of Louisiana, and did not continue in the United States after the State was formed. It was therefore contended that

the United States could neither take the property, nor dispose of it or enforce the public use to which it had been appropriated. · A decree was rendered in the District Court in favor of the United States, and an injunction granted as prayed, but on appeal to the Supreme Court it was reversed, and it was held that the bill could not be maintained by the United States because they had no interest in the property. Upon the question whether any interest in the property passed to the United States under the treaty of cession, the court said, speaking through Mr. Justice McLean:

"In the second article of the treaty, ' all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices, which are not private property,' were ceded. And it is contended, as the language of this article clearly includes the ground in controversy, whether it be considered a public square or vacant land, the entire right of the sovereign of Spain passed to the United States.

"The government of the United States, as was well observed in the argument, is one of limited powers. It can exercise authority over no subjects, except those which have been delegated to it. Congress cannot, by legislation, enlarge the Federal jurisdiction, nor can it be enlarged under the treaty-making power.

"If the common in contest, under the Spanish crown, formed a part of the public domain or the crown lands, and the king had power to alienate it, as other lands, there can be no doubt that it passed under the treaty to the United States, and they have a right to dispose of it the same as other public lands. But if the King of Spain held the land in trust for the use of the city, or only possessed a limited jurisdiction over it, principally, if. not exclusively, for police purposes, was this right passed to the United States under the treaty?

"That this common, having been dedicated to the public use, was withdrawn from commerce, and from the power of the king rightfully to alien it has already been shown; and also, that he had a limited power over it for certain purposes. Can the Federal government exercise this power? If it can, this court has the power to interpose an injunction or interdict

to the sale of any part of the common by the city if they shall think that the facts authorize such an interposition.

"It is insisted that the Federal government may exercise this authority under the power to regulate commerce.

"It is very clear that, as the treaty cannot give this power to the Federal government, we must look for it in the Constitution, and that the same power must authorize a similar exercise of jurisdiction over every other quay in the United States. A statement of the case is a sufficient refutation of the argument.

"Special provision is made in the Constitution for the cession of jurisdiction from the States over places where the Federal government shall establish forts or other military works. And it is only in these places, or in the Territories of the United States, where it can exercise a general jurisdiction.

"The State of Louisiana was admitted into the Union on the same footing as the original States. Her rights of sovereignty are the same, and, by consequence, no jurisdiction of the Federal government, either for purposes of police or otherwise, can be exercised over this public ground, which is not common to the United States. It belongs to the local authority to enforce the trust and prevent what they shall deem a violation of it by the city authorities.

"All powers which properly appertain to sovereignty, which have not been delegated to the Federal government, belong to the States and the people."

The decree of the District Court was accordingly ordered to be reversed and annulled.

This doctrine of the Supreme Court in the New Orleans case is decisive of the question pending before us in the present case and must control the decision.

It was also held in *Illinois Central Railroad* v. *Illinois*, that the ownership in fee of the streets, alleys, ways, commons, and other public ground on the east front of the city bordering upon Lake Michigan, in fractional section ten, was a good title, the reason assigned being that by the statute of Illinois the making, acknowledging, and recording

of plats operated to vest the title in the city in trust for the ·public uses to which the grounds were applicable. 146 U..S. 387, 462.

· It follows from these views that the United States have no just claim to maintain their contention to control or interfere. with any portion of the public ground designated in the plat· of the Fort Dearborn reservation. The decree dismissing the information will therefore be

*Affirmed.*

MR. JUSTICE BREWER, with whom concurred MR. JUSTICE ·BROWN, dissenting.

I am unable to .concur in the views expressed·by the court in this case. I agree that the United States have no governmental interest or control over the premises in question ; ,that as a sovereign they have no right to maintain this suit; that · by the act of dedication they parted with the title, and that, . in accordance with the statute of the State in respect to dedi-.cation, the fee passed to the city of Chicago, to " be held in the corporate name' thereof, in trust to and for the uses and purposes set forth ahd expressed or intended." I agree that the only rights which the United States have are those which any other owner of real estate would have under a like dedica-. tion ; but I think the law is' that he who grants property to a trustee, to be held in trust for a specific purpose, retains such an interest as gives him a right to invoke the interposition of a court of equity to prevent the use of that property for any other purpose. Can it be that, if the government, believing that the Congressional Library has become too large for con-" venient use in this city, donates half of it to the city of Chicago, to be kept and maintained as a public library, that city can, after accepting the donation for the purposes named, give away the books to the various lawyers for their private ·libraries, and the government be powerless to restrain such disposition ? · Do the donors of libraries or the grantors of real estate in trust for specific purposes, though parting with the · title, lose all right to invoke the aid · of a court 'of' equity to

compel the use of their donations and grants for the purposes expressed in the gift or deed? I approve the opinion of the Supreme Court of Iowa, in the case of *Warren* v. *The Mayor of Lyons City,* 22 Iowa, 351, 355, 357. In that case the plaintiffs had years before platted certain land as a site for a city, and on the plat filed by them there was a dedication of a piece of ground as a "public square." After the city had been built up on that site the authorities, for the purposes of gain, and under the pretended authority of an act of the legislature, attempted to subdivide the public square into lots and to lease them to individuals for private uses. A bill was filed by the dedicators to restrain such diversion of the use, and a decree in their favor was affirmed by the Supreme Court. I quote from the opinion:

"Nothing can be clearer than that if a grant is made for a specific, limited, and defined purpose, the subject of the grant cannot be used for another, and that the grantor retains still such an interest therein as entitles him in a court of equity to insist upon the execution of the trust as originally declared and accepted. *Williams* v. *First Presbyterian Society,* 1 Ohio St. 478; *Barclay* v. *Howell's Lessee,* 6 Pet. 498; *Webb* v. *Moler,* 8 Ohio, 548; *Brown* v. *Manning,* 6 Ohio, 298."

And again, after picturing the injustice which in many cases would result by permitting such a diversion, the court adds:

"Such a doctrine would enable the State at pleasure to trifle with the rights of individuals, and we can scarcely conceive of a doctrine which would more effectually check every disposition to give for public or charitable purposes. No, it must be, that if the right vested in the city for a particular purpose the legislature cannot vest it for another; that, when the dedicator declared his purpose by the plat, the land cannot be sold or used for another and different one; that while the corporation took the premises as trustee, it took them with the obligations attached as well as the rights conferred; that while the legislature might give the control and management of these squares and parks to the several municipal corporations, it cannot authorize their sale and use for a purpose foreign to the object of the grant.

"Without quoting, we cite the following cases: *Trustees of Watertown* v. *Cowen*, 4 Paige, 510; 2 Stra. 1004; *Commonwealth* v. *Alberger*, 1 Whart. 469; *Pomeroy* v. *Mills*, 3 Vermont, 279; *Abbott* v. *Same*, 3 Vermont, 521; *Adams* v. *S. & W. R. R. Co.*, 11 Barb. 414; *Fletcher* v. *Peck*, 6 Cranch, 87; *Godfrey* v. *City of Alton*, 12 Illinois, 29; Sedgwick's Constitutional and Statute Law, 343, 344; *Haight* v. *City of Keokuk*, 4 Iowa, 199; *Grant* v. *City of Davenport*, 18 Iowa, 179; *Le Clercq* v. *Trustees of Gallipolis*, 7 Ohio, 217; *Common Council of Indianapolis* v. *Cross*, 7 Indiana, 9; *Rowans, Executor*, v. *Portland*, 8 B. Mon. 232; *Augusta* v. *Perkins*, 3 B. Mon. 437."

I do not care to add more, but for these reasons withhold my assent to the opinion.

I am authorized to say that MR. JUSTICE BROWN concurs in this dissent.

The CHIEF JUSTICE, having been of counsel in the court below, took no part in the consideration and decision of this case on appeal.